894 P.2d 688

Raymond ESPINOZA, Petitioner,

v.

Honorable Gregory H. MARTIN, a judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

STATE of Arizona, ex rel. Richard ROMLEY, Maricopa County Attorney, Real Party in Interest.

No. CV–94–0067–PR.

Supreme Court of Arizona, En Banc.

April 20, 1995.

Wisdom, Logan & McNulty by James L.P. Logan, Jr., Phoenix, for petitioner.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Div., R. Wayne Ford, Asst. Atty. Gen., Phoenix, for respondent Judge.

Richard M. Romley, Maricopa County Atty. by Gerald R. Grant, Deputy County Atty., Phoenix, for real party in interest.

Law Offices of Dennis C. Jones by Dennis C. Jones, Leigh B. Jones, Phoenix, amicus curiae for Arizona Attys. for Crim. Justice.

CORCORAN, Justice.

Petitioner Raymond Espinoza, a criminal defendant in Maricopa County, challenges the policy adopted by a group of Maricopa County Superior Court judges of summarily rejecting all plea agreements containing stipulated sentences. The court of appeals affirmed the policy. We granted review, and we have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and rule 31.19, Arizona Rules of Criminal Procedure.

## FACTS AND PROCEDURAL HISTORY

The criminal divisions of the Maricopa County Superior Court are divided into four groups designated as quadrants A through D. Quadrant B, consisting of 5 judges, pre-

sides over felony offenses committed in the justice court precincts of Gila Bend, Tolleson, West Phoenix, and Maryvale. On December 28, 1992, the quadrant B judges issued a memorandum detailing a new plea agreement policy that was scheduled to take effect on January 25, 1993. The policy stated that quadrant B judges would no longer accept any plea agreements containing stipulated sentences because sentencing "is a judicial function which should not be subjected to limitations which are imposed by the parties, but are not required by law." Although quadrant B had already adopted the policy, the memorandum indicated that the judges would welcome feedback. After holding a meeting to consider such feedback, the quadrant B judges issued a revised version of their policy on January 15, 1993 (quadrant B policy). The relevant section of that policy reads as follows:

> 1. Plea agreements may stipulate to "probation," or "department of corrections" [DOC] for felonies, or "county jail" for misdemeanors. Agreements may *not* stipulate to *any* term of years (other than lifetime probation in dangerous crimes against children) or to *any* non-mandatory terms and conditions of probation (including, but not limited to, jail time, fines or surcharges, or community service hours), or to sentences running concurrently or consecutively, except for DOC time followed by lifetime probation in dangerous crimes against children.

The *only* 2 exceptions to the quadrant B policy are as follows:

> 2. Exceptions will be made for legitimate cooperation agreements. If the state wishes to make stipulated sentencing concessions in exchange for information, testimony or cooperation from a defendant, that fact should be made known to the judge in an appropriate manner prior to the change of plea.
>
> . . . .
>
> 4. Stipulations in capital murder cases to life imprisonment are viewed by the judges as charging concessions and not true sentencing stipulations. Therefore, such stipulations are unaffected by the policy.

On June 2, 1993, Espinoza was indicted on one count of offering to sell narcotic drugs and one count of misconduct involving weapons. At his arraignment, the case was assigned to respondent, quadrant B Judge Gregory H. Martin. On August 11, 1993, Espinoza appeared before Judge Martin in chambers to enter a plea of guilty to both counts pursuant to a plea agreement, which stipulated that the sentences would run concurrently with each other and with an unrelated probation revocation. Judge Martin summarily rejected Espinoza's plea agreement because the stipulation to concurrent sentences violated the quadrant B policy. On August 31, 1993, Espinoza presented Judge Martin with the same plea agreement, this time in court and on the record, and the judge again rejected the agreement without giving it any individualized consideration because, as *he noted, "[t]he sentencing provisions are all contrary to the Quad B policy."* (Emphasis added.)

Following Judge Martin's ruling, Espinoza filed a petition for special action. The court of appeals accepted jurisdiction, but denied relief, holding that the quadrant B policy was a proper exercise of judicial authority. *Espinoza v. Martin,* 180 Ariz. 608, 886 P.2d 1364 (App.1993). Espinoza then filed a petition for review. We granted review to consider the validity of the quadrant B policy because it presents an issue of statewide importance that this court has not previously decided.

## QUESTIONS PRESENTED

I.  Whether the quadrant B policy violates rule 17.4, Arizona Rules of Criminal Procedure, because it prevents the trial court from exercising its discretion when deciding whether to accept or reject a plea agreement containing a stipulated sentence.

II. Whether the quadrant B policy violates rule 36, Arizona Rules of Criminal Procedure, because it establishes an unapproved local rule that is inconsistent with the Arizona Rules of Criminal Procedure.

## DISCUSSION

### I. *Violation of Rule 17.4*

■ Rule 17.4, Arizona Rules of Criminal Procedure, governs plea negotiations and agreements. This court has stated that "[t]he rules [of criminal procedure] recognize that properly negotiated plea agreements . . . are an essential part of the criminal process and can enhance judicial economy, protect the resources of the State, and serve the ends of justice for the defendant, the State and the victim." *State v. Superior Court,* 125 Ariz. 575, 577, 611 P.2d 928, 930 (1980). This case turns on the meaning of rule 17.4(a), which reads as follows:

> **Plea Negotiations.** The parties may negotiate concerning, and reach an agreement on, any aspect of the disposition of the case. The court shall not participate in any such negotiation.

The plain language of rule 17.4(a) gives the parties the right to negotiate and reach agreement on *"any* aspect of the disposition of the case."* (Emphasis added.) This means that "the State and the defendant may bargain both as to the plea of guilty and as to the sentence to be imposed." *Superior Court,* 125 Ariz. at 577, 611 P.2d at 930.

Although rule 17.4(a) allows the parties to negotiate plea agreements, including sentences, rule 17.4 also grants trial courts considerable discretion in deciding whether to accept or reject such agreements. *State v. De Nistor,* 143 Ariz. 407, 411, 694 P.2d 237, 241 (1985). Rule 17.4(d) provides in part:

> **Acceptance of Plea.** After making such determinations [of the accuracy of the agreement and the voluntariness and intelligence of the plea] and considering the victim's view, if provided, the court shall either accept or reject the tendered negotiated plea.

Furthermore, even if a trial court accepts a plea agreement, it is not bound by negotiated provisions regarding the sentence or the terms of probation if a review of the presentence report reveals the inadequacy of those provisions. Rule 17.4(d) and Form XVIII, Arizona Rules of Criminal Procedure.

In order to ensure that agreements negotiated pursuant to rule 17.4(a) have some meaningful effect, we interpret rule 17.4 as guaranteeing the parties the right to present their negotiated agreement to a judge, to have the judge consider the merits of that agreement in light of the circumstances of the case, and to have the judge exercise his or her discretion with regard to the agreement. Instead of hampering judicial sentencing discretion, the current version of rule 17.4, taken as a whole, contemplates the exercise of judicial discretion when determining whether to accept or reject each particular plea agreement. In exercising that discretion, the trial court must "review the plea agreement to see if the ends of justice and the protection of the public are being served by such agreement." *Superior Court,* 125 Ariz. at 577, 611 P.2d at 930.

Therefore, the court of appeals correctly noted that "[t]he language in rule 17.4(a), allowing the parties to 'negotiate' and 'agree' upon any aspect of the case, does not give the parties or the lawyers the right to force unwilling judges to accept plea agreements with sentence stipulations." *Espinoza,* 180 Ariz. at 613, 886 P.2d at 1369. However, the court of appeals erroneously believed that allowing the parties to negotiate stipulated sentences, pursuant to rule 17.4(a), conferred a "binding sentencing power" on the prosecutor in violation of the separation of powers. 180 Ariz. at 614, 886 P.2d at 1370. After giving full consideration to the appropriateness of a plea agreement, the trial court has the discretion to either accept or reject the entire plea agreement, or to accept the agreement and later reject the sentencing provisions if deemed inappropriate after further inquiry. Therefore, there was no need for the court of appeals to try to further enhance judicial sentencing discretion by approving a policy that limited the parties' right to negotiate.

This court has previously invalidated policies that limit the exercise of judicial discretion in accepting plea agreements. In the analogous case of *Hare v. Superior Court,* this court struck down a guideline in part because it conflicted with rule 17.4. 133 Ariz. 540, 542–43, 652 P.2d 1387, 1389–90 (1982). Guideline B, adopted by the Pima County Superior Court, provided that "after

the first trial date, no plea agreements would be accepted by the court except those which result in pleas to the charges contained in the indictment." *Hare,* 133 Ariz. at 541, 652 P.2d at 1388. In holding that guideline B exceeded the limits imposed on the superior court by rule 17.4(a), we reasoned that rule 17.4

> recognizes not only the right to engage in plea negotiation and agreement, but provides for the procedure by which the judge rejects or accepts a plea agreement. Rules 17.4(d) & (e) allow the judge to exercise his discretion when a plea agreement is presented for approval. Under Guideline B, the court is prohibited from exercising that discretion. . . .

*Hare,* 133 Ariz. at 542, 652 P.2d at 1389. In *Hare,* guideline B prevented the trial court from considering plea agreements after a certain date. In this case, quadrant B policy prevented the trial court from considering plea agreements with stipulated sentences. The end result is the same. The quadrant B policy, like guideline B in *Hare,* violates rule 17.4 because it precludes a judge from exercising his discretion over plea agreements in a predetermined set of circumstances.

Espinoza, his attorney, and the prosecutor negotiated pursuant to rule 17.4(a) and reached a plea agreement. Espinoza agreed to plead guilty to two charges: attempting to knowingly sell a narcotic drug and knowingly possessing a deadly weapon during the commission of a felony. In exchange, the parties agreed that the sentences imposed on both charges would be served concurrently, and that those sentences would also be concurrent with a probation revocation.

When Espinoza presented Judge Martin with this plea agreement on two different occasions, the judge summarily rejected it both times because the stipulation to concurrent sentences violated the quadrant B policy. Judge Martin did not consider the particular circumstances of the case and made no findings regarding the appropriateness of the negotiated sentence. Instead, the presence of a stipulated sentence in the agreement triggered the quadrant B policy and precluded any individualized exercise of discretion. Absent the quadrant B policy,

Judge Martin could have weighed the merits of the plea agreement and accepted it, rejected it entirely, or rejected the sentencing provisions as inappropriate once he had reviewed the presentence report. This is the type of discretion contemplated by rule 17.4, and trial courts are obligated to exercise it.

Because the quadrant B policy simultaneously limits the content of plea agreements and precludes the exercise of judicial discretion over individual plea agreements, we hold that the policy violates rule 17.4. While courts are free, pursuant to rule 17.4(d), to reject plea agreements with stipulated sentences after giving them individualized consideration, groups of judges may not implement policies to automatically reject all such plea agreements without considering whether a stipulated sentence is appropriate in light of the circumstances of the case.

Our holding applies equally to the actions of individual judges. The respondent relies on *State ex rel. Bowers v. Superior Court* in which the court of appeals held that a trial judge in Navajo County, acting alone and not pursuant to a written policy, did not abuse his discretion by summarily rejecting a plea agreement because it contained a stipulated sentence. 173 Ariz. 34, 40, 839 P.2d 454, 460 (App.1992). We denied review in *Bowers,* and we now express our disapproval of that case to the extent that it allows a trial judge to automatically reject a plea agreement without individualized consideration because it contains a stipulated sentence.

## II. *Violation of Rule 36*

As noted above, we hold that the quadrant B policy violates rule 17.4, Arizona Rules of Criminal Procedure. We further hold that the quadrant B policy violates rule 36, Arizona Rules of Criminal Procedure, because quadrant B adopted a rule that is inconsistent with the Arizona Rules of Criminal Procedure. Even if the quadrant B policy were consistent with the rules of procedure, the policy constituted a local rule that was invalid because quadrant B adopted it without first obtaining the approval of this court.

██ This court has the exclusive power to make rules pertaining to all procedural mat-

ters in any Arizona court. Ariz. Const. art. 6, § 5(5). This rulemaking power "may not be supplemented, annulled or superseded by an inferior court." *Anderson v. Pickrell,* 115 Ariz. 589, 590, 566 P.2d 1335, 1336 (1977). However, rule 36 provides that:

> Any court may make and amend rules governing its practice not inconsistent with these rules. No such rule shall become effective until approved in writing by the Supreme Court.

This issue turns on the meaning of the word "rule" as used in rule 36, because quadrant B was required to obtain this court's approval if the policy it adopted constituted a procedural rule. The court of appeals held that the quadrant B policy did "not rise to the level of a procedural rule" and therefore did not require the approval of this court. *Espinoza,* 180 Ariz. at 616, 886 P.2d at 1372.

"A rule of court prescribes a procedural course of conduct that litigants are required to follow, the failure to comply with which may deprive the parties of substantial rights." *Hare,* 133 Ariz. at 542, 652 P.2d at 1389. *Hare* involved a set of guidelines adopted by the Pima County Superior Court to facilitate its Automated Calendaring Project. In that case, we held that a guideline requiring judges to automatically reject plea agreements in certain circumstances was invalid in part because it was an unapproved local rule. *Hare,* 133 Ariz. at 542, 652 P.2d at 1389. The court reasoned that the Pima County guidelines

> prescribe a course of conduct for certain aspects of the criminal practice in Pima County Superior Court. They are, in effect, local rules of criminal procedure which parties to criminal actions in Pima County must follow or lose substantial rights, in this case the right to have a plea bargain considered by the court.

*Hare,* 133 Ariz. at 542, 652 P.2d at 1389. This court relied on *Hare* in a later case when we held that an order by the chief city magistrate of Tucson requiring the prosecutor to make an avowal of good faith before filing for a change of judge was a local rule that was invalid for lack of this court's approval. *State v. City Court,* 150 Ariz. 99, 103, 722 P.2d 267, 271 (1986).

Under the standard set forth in *Hare,* the quadrant B policy is a local rule of procedure. Just as in *Hare,* the policy adopted by quadrant B requires the participating judges to automatically reject plea agreements under certain circumstances. The quadrant B policy requires litigants to omit all stipulated sentences from their plea agreements, and it deprives the parties of the right to have the judge consider their plea agreements on a case-by-case basis.

In *Hedlund v. Sheldon,* we held that a trial judge's decision to impanel dual juries for co-defendants was not a rule of procedure, but rather was "'the exercise of an individual judge's discretion to use a particular technique in order to meet a specific problem' in a single case." 173 Ariz. 143, 146, 840 P.2d 1008, 1011 (1992), quoting *State v. Lambright,* 138 Ariz. 63, 78, 673 P.2d 1, 16 (1983) (Feldman, J., specially concurring), *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Here, the respondent judge cites *Hedlund* as support for his assertion that the quadrant B policy is not a rule, but instead involves a group of judges jointly deciding to use a discretionary technique.

First, *Hedlund* is applicable only when a trial judge adopts a technique that is consistent with the rules of this court. The quadrant B policy violates rule 17.4 and thus is inconsistent with the rules of this court. Moreover, *Hedlund* is easily distinguishable from this case because it involved one judge using a particular technique to solve a problem in a single case. The quadrant B policy, on the other hand, is an agreement among a group of judges to apply a particular procedure, under a predetermined set of circumstances, in all cases that come before those judges. *Hedlund* does not change our opinion that, under *Hare,* the quadrant B policy is a local rule within the meaning of rule 36.

■ Having concluded that the quadrant B policy is a rule, we hold that the policy is therefore invalid because the quadrant B judges failed to obtain the approval of this court before adopting it. If we allow quadrant B, or any other faction of superior court judges, to adopt its own rules without first coming to this court for approval, proce-

dure within the Arizona court system would become balkanized. Under *Bowers* and the quadrant B policy, one judge in Navajo County and 5 judges in Maricopa County refused to accept any plea agreement containing a stipulated sentence and refused to consider the agreement and the stipulated sentence on a case-by-case basis. In all other courts, judges presumably give individualized consideration to all plea agreements, even those with stipulated sentences. The purpose of rule 36 is to promote procedural uniformity, and unapproved local rules that conflict with statewide rules of procedure contravene that purpose.

At oral argument, respondent judge alleged that the quadrant B policy was simply an experiment, which is common practice in superior courts. However, no evidence in the record supports this theory. Once the quadrant B policy took effect, no one gathered statistics or conducted contemporaneous interviews with interested parties on an ongoing basis to track the results of the "experiment." In addition, no control groups were identified for comparison and no time limit was set for the project. The judges participating in the quadrant B "experiment" were not randomly selected, but instead they self selected into the project presumably because they favored the quadrant B policy. In short, the quadrant B judges cannot now claim that their policy was an experiment when they failed to follow any accepted experimental methodology. *See generally Experimentation in the Law: Report of the Federal Judicial Center Advisory Committee on Experimentation in the Law* 15–23, 71–76, 81–121 (Fed.Judicial Ctr.1981); David P. Farrington, *Randomized Experiments on Crime and Justice, in* 4 *Crime and Justice: An Annual Review of Research* 257, 271–76, 296–98 (Michael Tonry & Norval Morris eds., 1983); John Monahan & Laurens Walker, *Social Science in Law: Cases and Materials* 57–61 (1994).

Even if the quadrant B policy were a legitimate experiment, the judges in quadrant B are still subject to the provisions of rule 36. In *Hare*, we held that the guidelines adopted in Pima County violated rule 36, even though they were part of a superior court experiment to promote trial certainty and reduce delay. 133 Ariz. at 541, 543, 652 P.2d at 1388, 1390. Although we find that the adoption of the quadrant B policy is not a legitimate experiment, "[n]othing we say here should discourage courts, through the adoption of local rules, to carry out experiments which may improve the judicial process. Indeed, these efforts should be encouraged. But local rules must first be approved by this court before they are effective." *Hare*, 133 Ariz. at 543, 652 P.2d at 1390.

Defendant makes a final claim that the quadrant B policy violates the equal protection clause of the Fourteenth Amendment of the United States Constitution because it treats similarly situated defendants differently depending on the geographic location of the crime scene. Furthermore, the policy subjects defendants in quadrant B to procedures different from those made applicable to other quadrants by rule 17.4. Because we conclude that the quadrant B policy conflicts with the Arizona Rules of Criminal Procedure, it is unnecessary to decide this constitutional issue. *State v. Yslas*, 139 Ariz. 60, 63, 676 P.2d 1118, 1121 (1984).

### III. *Justice Martone's Dissent*

The dissent warrants a brief mention. Justice Martone argues that the quadrant B policy is valid because "[i]f, after looking at the document, a judge is opposed to any part of the plea, he or she may summarily reject it [pursuant to rule 17.4]. And that is precisely what Judge Martin did here." *Espinoza v. Martin*, 182 Ariz. 145, 146, 894 P.2d 688, 689 (1995) (Martone, J., dissenting). However, the quadrant B policy required Judge Martin to reject Espinoza's plea agreement whether or not he actually looked at the document. The dissent fails to explain how a policy that categorically predetermines the fate of certain plea agreements is consistent with rule 17.4, which requires an individualized review of each and every plea agreement.

The dissent further argues that, according to rule 17.4, Judge Martin "was free to accept or reject [the quadrant B policy], altogether or in a specific case." *Espinoza*, 182 Ariz. at 148, 894 P.2d at 691. Whether

Judge Martin had the discretion to accept or reject the quadrant B policy is irrelevant to an analysis of rule 17.4, which deals with the exercise of discretion over individual plea agreements and not over judicial policies. Furthermore, the dissent refuses to acknowledge that once Judge Martin accepted the quadrant B policy as a whole, he was not free to reject the policy "in a specific case." The whole point of the quadrant B policy was to lock the participating judges into a predetermined course of action in the large majority of cases, such as this one, where the narrow exceptions to the quadrant B policy do not apply. That is why the policy precludes the exercise of discretion over individual plea agreements that rule 17.4 contemplates. If, as Justice Martone suggests, Judge Martin were merely following rule 17.4, then there was no need to adopt the quadrant B policy.

In light of our holding in this case, the dissent asks "what of the Rule V Inactive Calendar Guidelines and the Guidelines for Rule 26.1" adopted by the Maricopa County Superior Court. *Espinoza*, 182 Ariz. at 154 n. 1, 894 P.2d at 697 n. 1 (citations omitted). The obvious distinction is that both sets of guidelines, by their terms, were adopted in an attempt "to facilitate uniform and predictable application" of rules 26.1 and V—not to negate those rules.

■ Although the dissenting opinion refers to the quadrant B policy as "the quadrant B experiment," this label is meaningless because the dissent fails to offer any facts proving up the legitimacy of the so-called experiment. *Espinoza*, 182 Ariz. at 154 n. 1, 894 P.2d at 697 n. 1. When a court of this state wants to conduct a legitimate experiment, which is at variance with existing rules of court, that court should present a proposal to this court for approval *before* the experiment commences.

## DISPOSITION

We hold that the quadrant B policy of summarily rejecting plea agreements with stipulated sentences violates both rules 17.4 and 36, Arizona Rules of Criminal Procedure. Therefore, we find that the court of appeals erred when it approved this policy and denied the relief requested in defendant's petition for special action. We reverse the trial court, vacate the court of appeals' decision, and remand this case to the trial court so that it may fully review the appropriateness of the plea agreement presented by the county attorney and the defendant and exercise its discretion in accepting or rejecting that agreement.

MOELLER, V.C.J., concurs.

FELDMAN, Chief Justice, specially concurring.

I fully concur in the majority opinion. Two comments in Justice Martone's dissent, however, require a response from the Chief Justice.

Because the dissent departs from the issue before us to castigate the court for failing to adopt the petition to amend Ariz.R.Crim. Proc. 17.4, it is appropriate to explain why we did not adopt that proposal. The dissent makes much of the number of comments favoring the petition, *see* dissent at n. 2, but, as is often the case, the numbers do not paint an accurate picture. Other than judges, only three writers, none of whom is a practicing lawyer, supported the rule change. The dissent fails to mention that, in fact, several judges opposed the change and that the comments of representatives of the lawyers who would have had to practice under the proposed rule were unanimously unfavorable.[1] The prosecutors opposed it on the grounds that it was contrary to the interests of victims and the public, and the defense bar opposed it on the grounds that it would significantly hinder their attempts to obtain fair treatment for their clients under a mandatory sentencing regime.

1. Writing on behalf of their respective offices were: Richard Romley, Maricopa County Attorney; Grant Woods, Arizona Attorney General; Kerry Wangberg, Phoenix City Prosecutor; Christopher Johns, Deputy Maricopa County Public Defender; and Kenneth Everett, Mohave County Public Defender. Other opposing comments were filed by Bruce Hamilton, on behalf of the State Bar's Criminal Justice Section and Criminal Rules Committee, and Michael Baumstark, on behalf of the Arizona Judicial Council.

While the dissent dismisses these comments as merely those of "institutional bar groups," we necessarily assume that the State Bar and its Criminal Justice Section speak for lawyers in general and certainly for those prosecutors and defense lawyers who practice criminal law. Nor can we so lightly dismiss the views of every Maricopa County prosecutorial and defender office, particularly in the rare instance when these normally opposing groups agree. It is essential, we believe, to appropriately consider practitioners' views of the vicissitudes of daily practice under the proposed change. This is especially true when, as in this case, the presiding judge of the criminal division of the Maricopa County bench agreed with those lawyers.

This debate is, of course, a non-issue in this case. See Yepes–Prado v. United States Immigration & Naturalization Serv., 36 F.3d 83 (9th Cir.1994). Those readers who desire an in-depth review, however, should peruse the comment to the petition to amend Rule 17.4 filed by Judge Ronald S. Reinstein, Presiding Criminal Judge of the Maricopa County Superior Court. A copy of that comment is attached as an appendix. [Editor's Note: See p. 30 for Appendix.] It is appropriate, however, to quote here one paragraph of that comment:

> While some have argued that sentencing stipulations are regularly crafted by inexperienced young attorneys, and judges are best suited to determine in the first instance what an appropriate disposition in a case should be, the fact is that most of the more significant and sensitive cases in the justice system are handled by experienced prosecutors and defense attorneys who have lived and breathed these cases for months. The sentencing judge on the other hand more than likely only reviews the presentence report the night before sentencing. Many of those judges, while perhaps experienced in life and the law, at least in the beginning of their judicial careers or their assignment to the criminal bench, have no experience at all in criminal sentencing. We are not all anointed with mystical and instant wisdom when we don our judicial robes.

Comment of Ron Reinstein in Opposition to the Petition, filed Sept. 20, 1994, at 2–3.

Some may believe that we should damn the torpedoes and go forward with a rule opposed by all who would have to practice under it, but I disagree. Although we may empathize with the judges who seek to regain some of the discretion taken from them by mandatory sentencing, we must listen to those who would have had to practice under the changed rule.[2] From the comments, it appeared that every lawyer practicing in the field believed the proposal would not work, would create havoc in the courts, and would be unfair to the public, victims, and defendants. Although these views did not and do not sway the dissenter, they convinced four members of the court that it would be an abuse of power to impose the rule until it was first tried with a group willing to experiment. That experiment is presently being implemented. Thus, it is not accurate for the dissent to say we have rejected the proposal. The final decision will come after we see how it works on an experimental basis.

Nor is it proper to criticize this court for not being in the "forefront on reform in the criminal justice system." Dissent at 155, 894 P.2d at 698. This, perhaps, is the first time that anyone has accused us of lacking concern for reform of our justice system, whether civil or criminal. Indeed, one often hears criticism that the court may be too involved in reform efforts and rule changes. At any rate, eagerness to reform does not require us to agree with every project presented. Sometimes we must say no, even when we would like to say yes. The unanimous, in-

---

2. We are not unsympathetic to the judges' views. Underlying this tempest, however, is the dissent's implicit assumption that the views of practicing lawyers are to be disregarded while those of the judges, who need suffer none of the consequences of the imposition of a rule that the lawyers consider unworkable, should be accepted notwithstanding the bar's unanimous opposition. We understand the judges' desires to take back their sentencing power. Believing, with the judges, that the administration of justice would be better served if they were to regain at least some of their sentencing discretion, I for one recommend that they get off their hassocks and out of their judicial towers to join those who are working to persuade the public and the legislature that the present scheme does not well serve the ends of justice.

formed, and reasoned opposition of the practicing bar should and does raise our apprehension. Service on the supreme court does not confer supreme power, but does instill the need for caution.

ZLAKET, Justice, concurring in part and dissenting in part.

I concur that the "quadrant B policy" constituted an unapproved local rule. *See Hare v. Superior Court,* 133 Ariz. 540, 542, 652 P.2d 1387, 1389 (1982); Rule 36, Ariz. R.Crim.P. Thus, I reach the same result as the majority. I cannot agree, however, that *State ex rel. Bowers v. Superior Court,* 173 Ariz. 34, 839 P.2d 454 (App.1992) should be disapproved "to the extent that it allows a trial judge to automatically reject a plea agreement without individualized consideration because it contains a stipulated sentence." *Ante* at 148, 894 P.2d at 691.

The requirement that judges give "full" regard to such plea agreements before rejecting them, *ante* at 148, 894 P.2d at 691, creates an unenforceable standard and invites unwarranted challenges based on alleged abuses of discretion. Must judges now articulate reasons for rejecting pleas in order to demonstrate that they are not doing so merely because agreements contain stipulated sentences? Will an individual judge's motives be suspect if he or she, without explanation, rejects a series of pleas containing such stipulations? If so, will hearings be required or permitted to ascertain those motives? I fear there is unintended mischief lurking in today's decision.

The majority concedes that judges are empowered to reject plea agreements. I am of the additional opinion that they should be permitted to summarily reject those containing stipulated sentences for that reason alone, without having to go through the charade of considering each case individually. My hope is that most judges would not routinely follow such a course of action, at least until we can be sure it causes no damage to the plea-bargaining process that constitutes an integral part of our criminal justice system. Nevertheless, arriving at a general principle applicable to a class of plea agreements, after full consideration of the issue,

seems to me more honest, more efficient, and every bit as thoughtful as pondering each agreement individually before rejecting it.

I read and interpret Rule 17, Ariz.R.Crim. P., just as the court of appeals did in *Bowers.* The trial judge in that case was completely frank about his reasons for rejecting the plea agreement, and it is not difficult to understand or appreciate his view:

On the face of the Agreement in this matter, there is absolutely no discretion by the Court regarding any of the charges that the defendant is pleading guilty to. I do not know whether I would sentence that defendant to more or less. . . .

But there is no question in the Court's mind that this particular Plea Agreement absolutely eliminates the need for the court. You may as well do it without me.

173 Ariz. at 37, 839 P.2d at 457.

I believe the court's ruling today not only threatens such candor but also reinforces the purely ministerial role about which the judge in *Bowers* so vehemently and properly complained. Sentencing is, or at least should be, a judicial function. Regrettably, mandatory sentencing schemes have eliminated a great deal of judicial discretion in such matters. I prefer not to support a rule interpretation that potentially contributes to further erosion of this authority, especially where it is unnecessary to resolve the pending case.

MARTONE, Justice, dissenting.

I dissent. I would support the efforts of five trial judges to improve our criminal justice system. The opinion of the court of appeals and that of the majority here reflect very different views of the status of our criminal justice system and the role of the judge in it. The opinion of the court of appeals, *Espinoza v. Superior Court,* 180 Ariz. 608, 886 P.2d 1364 (App.1993), makes it clear that Judge Martin neither violated Rule 17.4, Ariz.R.Crim.P., nor acted pursuant to an unapproved local rule. I would adopt the opinion of the court of appeals as our own.

The quadrant B policy was not in conflict with Rule 17.4, Ariz.R.Crim.P. While Rule 17.4(a) allows the parties to agree on the disposition of a case, Rule 17.4(d) allows the

court to "either accept or reject the tendered negotiated plea." Even after acceptance, the court may reject sentencing stipulations. Rule 17.4(d). If, after looking at the document, a judge is opposed to any part of the plea, he or she may summarily reject it. And that is precisely what Judge Martin did here. That he and other judges agreed to exercise their rights under Rule 17.4(d) does not make his decision conflict with the rule. Indeed, their agreement is collectively supportive of the rule. No one forced Judge Martin to participate in the policy. He was free to accept or reject it, altogether or in a specific case. He accepted it because he thought it was a good idea. The quadrant B policy was not binding on any judge who did not want to be bound by it.

I disagree with the court's conclusion that the policy "violates rule 17.4 because it precludes a judge from exercising his discretion over plea agreements." *Ante*, at 154, 894 P.2d at 697. The policy did not prevent the trial court from exercising its discretion. The transcript of the plea proceeding shows this. Judge Martin said "I don't want to be bound by any of this." Tr. at 6. He said "I don't want it to be a part of the plea that he get concurrent sentences." *Id.* He said "I don't want to be bound by an agreement that I give him concurrent sentences now." *Id.* at 7. He said "I'm not going to take an agreement for concurrent sentences." *Id.* The transcript suggests that Judge Martin re-

fused to accept the plea because he believed it was inadvisable. He believed in the purposes sought to be achieved by the quadrant B policy. The premise (the policy precludes discretion) for the majority's conclusion is false.

Nor does the quadrant B policy constitute an unapproved local rule.[1] We made this quite clear in *Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992). We there distinguished between a "rule that was both adopted by the Pima County Superior Court as a whole and generally applied to all criminal cases being tried in that court," and "the exercise of an individual judge's discretion to use a particular technique in order to meet a specific problem." *Id.* at 146, 840 P.2d at 1011. Judge Martin's decision to subscribe to quadrant B policy was an exercise of his discretion to use a particular technique in order to meet a specific problem within the meaning of *Hedlund.* The quadrant B policy was not a rule adopted by the Superior Court of Arizona in Maricopa County to be "generally applied to all criminal cases being tried in that court." *Id.*

The majority invites the judges of the superior court to adopt a local rule and seek our approval for it. *Ante*, at 150, 894 P.2d at 693. But the Superior Court in Maricopa County has petitioned to amend Rule 17.4 to prohibit sentencing stipulations and the majority rejected it. See *In Re Rule 17.4, Rules of Criminal Procedure*, R–94–0007.[2]

---

1. If the quadrant B experiment constitutes a local rule, then what of the *Rule V Inactive Calendar Guidelines*, 17B A.R.S. (Supp.1994) at 63 and the *Guidelines for Rule 26.1*, 16 A.R.S. (Supp. 1994) at 75? The court's suggestion that the distinction is "obvious," *ante*, at 151, 894 P.2d at 694, because these guidelines do not "negate those rules," *id.*, overlooks Rule 83, Ariz.R.Civ. P., and Rule 36, Ariz.R.Crim.P., both of which provide that local rules may not be *"inconsistent with these Rules."* Thus if a procedure is consistent with our rules, it is eligible for approval as a local rule. If it "negate[s] those rules," as the court suggests, it is not eligible for local rule approval. *But cf.* Unif.R. of Prac. XIV.

2. Of the approximately 60 comments received, over 40 were in favor of prohibiting sentencing agreements. Here is what some of them said:

Charles E. Ares, McCormick Professor of Law Emeritus ("I wish to make the simple point that the so-called stipulated sentence results in a serious distortion of the adversary system and harms the public interest."); Gary T. Lowenthal, Professor of Law ("I ... have practiced criminal law for many years in courts outside Arizona in which the parties are not permitted to stipulate to the sentence to be imposed by the court ... I strongly support the amendments to Rule 17.4."); Judge Noel Fidel, Arizona Court of Appeals ("[T]heir proposal permits us collectively to take a very modest step toward reaffirming our role as judges and resuming our responsibility for the justice of the sentences we impose."); Chief Judge Thomas C. Kleinschmidt, Arizona Court of Appeals ("I strongly urge that the Supreme Court grant Judge Rose's Petition to Amend Rule 17.4, Rules of Criminal Procedure, to preclude stipu-

We are considering an experiment with the proposed amendment, but the majority rejected Maricopa County's request to participate in it.

I believe that this court should be in the business of rewarding creative efforts that arise elsewhere in the system. We have not been at the forefront of reform in the criminal justice system. For example, we did nothing with *A System in Crisis: The Report of the Committee to Study the Criminal Justice System in the Arizona Superior Court* (1993). A majority of the judges on that committee, but only one lawyer, favored

amendments to Rule 17 that would "allow the parties to negotiate a *recommended* sentence . . . . but which would prohibit a *stipulated* sentence." *Id.* at 26. The public knows the "criminal-justice system has all but collapsed." Meg Greenfield, *Scandal in the Courts*, Newsweek, Aug. 21, 1989 at 68. *See also* John H. Langbein, *Money Talks, Clients Walk*, Newsweek, Apr. 17, 1995, at 32. Those convicted of crimes know that too. Thomas E. McLaughlin, *Through Prisoners' Eyes*, A.B.A.J., Feb. 1995, at 100. The trial judges are trying new ideas as we approach the next millennium. We should support them.

lated sentencing."); Judge Rudolph J. Gerber, Arizona Court of Appeals ("Under the present practice of stipulated sentences, it is attorneys rather than judges who in fact impose sentences. Judges are reduced to the function of a mere rubber stamp."); Judge John L. Claborne, Arizona Court of Appeals ("[T]he present system does not allow the judge to really make an appropriate decision."); Judge B. Michael Dann, Superior Court of Arizona in Maricopa County ("[T]he widespread practice of stipulated sentencing is bad for the criminal justice system. It's bad for judges, it's bad for defendants and it's bad for the public."); Judge Robert D. Myers, Superior Court of Arizona in Maricopa County ("[U]nless Rule 17.4 of the Rules of Criminal Procedure is revised pursuant to the Petition of Judge Rose and the Maricopa County Superior Court Bench, this basic principle of criminal law (sentencing a judicial function) is history."); Judge Barry G. Silverman, Superior Court of Arizona in Maricopa County ("[T]he Supreme Court now has the opportunity to close down the criminal justice flea market and restore dignity and judicial responsibility to sentencing."); Judge Paul A. Katz, Superior Court of Arizona in Maricopa County ("I trust that the Supreme Court will not bow to the opportunistic pressures of the criminal bar, and will do what is philosophically and morally correct."); Judge Barry C. Schneider, Superior Court of Arizona in Maricopa County ("[I]t is my belief that giving the parties the power to stipulate to a sentence divests the court of its proper authority. . . . The image that I see, when judges are denied this authority, is of a goddess who, instead of holding a sword and the scales of justice, is manacled in handcuffs."); Judge H. Jeffrey Coker, Superior Court of Arizona in Coconino County ("[T]he bottom line is that we, as judges, have lost not only the confidence of the public, but the means of earning it back."); Judge Matthew W. Boroweic, Superior Court of Arizona in Cochise County ("[W]e have enough legal fictions with

which to contend which do not sit well either with logic or the public perception."); Judge H. Stewart Bradshaw, Superior Court of Arizona in Yuma County ("[T]he comment made recently at the Judicial Conference by a prosecutor that she must be granted the discretion to choose the sentence in order to assure that justice is done is, simply, posturing."); Judge Edward L. Dawson, Superior Court of Arizona in Gila County ("I believe that the suggested change would appropriately reinstate a degree of judicial independence in sentencings without seriously compromising the plea bargaining system now in effect."); Judge Lawrence H. Fleischman, Superior Court of Arizona in Pima County ("[W]e would do better simply hiring clerks to sign sentencing documents if the Maricopa County system prevails on a state-wide basis."); Judge Thomas W. O'Toole, Superior Court of Arizona in Maricopa County ("[U]nless the proposed Rule 17.4 amendment is adopted, judicial rubber stamping of sentences and the resulting abdication of judicial responsibility to impose an appropriate sentence will continue."); Judge Roberto C. Montiel, Superior Court of Arizona in Santa Cruz County ("[T]he sentencing of a defendant should not be left to the discretion of the prosecution or the defendant.").

Although institutional comments in opposition were filed by prosecuting offices and public defender offices, no comment in opposition was filed by any of the "lawyers who would have had to practice under the proposed rule." *Ante,* at 152, 894 P.2d at 695. The majority is persuaded by the opposition of institutional bar groups. It is natural enough for lawyers to not want to surrender their sentencing power to judges. But if judges, and not lawyers, ought to possess the power to sentence, the reluctance of lawyers to transfer that power ought not carry the day. The comments informed us that neither the federal courts nor those in other states acquiesce in sentencing agreements. If it works everywhere else, why will it not work here?

APPENDIX TO SPECIALLY CONCUR-
RING OPINION OF CHIEF JUSTICE
STANLEY G. FELDMAN

Comment of
Ron Reinstein
Presiding Criminal Judge
Superior Court of Arizona
in Maricopa County
IN THE SUPREME COURT
STATE OF ARIZONA

No. R–94–0007
IN THE MATTER OF RULE 17.4,
RULES OF CRIMINAL
PROCEDURE

Comment of Ron Reinstein in
Opposition to the Petition

[Filed Sept. 20, 1994]

I respectfully write in opposition to the Petition to amend Rule 17.4 of the Rules of Criminal Procedures. After having reviewed many of the comments in favor of and in opposition to the amendment it appears on the surface that this is largely a judge against lawyer issue. However, I believe that many judges throughout the state feel the same way that I do. There are passionate views expressed on both sides of the issue, but frankly many of the arguments simply overstate their respective cases.

It is apparent to me that many of the proponents of the amendment are frustrated with the extent of mandatory sentencing in our state. Yet the amendment will do nothing to change that. It is a function of the legislature to change our sentencing code. In fact, two sessions ago some progress was made in the area of drug laws and *Hannah* priors in particular to develop a more sensible approach to sentencing. Yet Arizona still has probably more mandatory sentences in its code than most other states.

If the proponents of the amendment believe that it will increase judicial discretion at sentencing, I believe they are naive in light of the power the prosecution has over sentencing enhancements in the charging area and also in light of the pressures put on the public prosecutor by the public, the media, and victims, in "sensitive" or dangerous cases. Given the nature of those pressures as well as the desire to see that justice is done there will be more occasions than presently occur where the prosecution will simply not drop an allegation of dangerousness, a prior conviction, or any of the other myriad of enhancements available.

The effect of this in a state with the extent of mandatories that we have will be harsher treatment for some defendants than they may otherwise deserve and also needless trauma for some victims who will have to testify at trials that perhaps otherwise could have been settled. This is particularly true for many victims of sexual assault and child molestation.

In an age when every other part of the justice system is moving toward alternative dispute resolution, mediation, and settlement, it seems incredulous that we would step backward in the criminal justice system. I can understand why this would be so if judges did not have the final say over whether a plea agreement was acceptable, but we in fact have that power and I believe most of us exercise it on a regular basis. Evidently though there are some who feel constrained not to for various reasons.

While some have argued that sentencing stipulations are regularly crafted by inexperienced young attorneys, and judges are best suited to determine in the first instance what an appropriate disposition in a case should be, the fact is that most of the more significant and sensitive cases in the justice system are handled by experienced prosecutors and defense attorneys who have lived and breathed these cases for months. The sentencing judge on the other hand more than likely only reviews the presentence report the night before sentencing. Many of those judges, while perhaps experienced in life and the law, at least in the beginning of their judicial careers or their assignment to the criminal bench, have no experience at all in criminal sentencing. We are not all anointed with mystical and instant wisdom when we don our judicial robes.

Another argument raised in favor of the amendment is that probation officers slant

their presentence reports and recommendations to support the sentencing stipulations in plea agreements. Frankly I see that as a slap in the face of the excellent probation officers in our state. If that occurs with some probation officers, it can be rectified by adequate training and education. Most of us have done much to encourage the use of independent judgment by probation staff and is evidenced by a increasing rate of reports which recommend against the stipulated pleas.

One misconception that needs to be addressed is the notion expressed by some that Pima County judges don't allow stipulated sentences. It's clear from Judge Brown and Veliz' comments and my experience that that is simply not true, but rather that most of the judges in Pima County follow the same policy as the "Quadrant B" judges in Maricopa County, which is to allow stipulations to probation or prison, but not as to the terms of probation or the number of years in prison, except in extraordinary circumstances. If there is to be a change, I believe that is the direction we should be heading rather than a complete ban on stipulated sentences.

The proponents of the amendment argue that it will prevent "behind the scenes" negotiations. In fact what will occur in many instances will be lawyers going behind closed doors in judges' chambers determining whether a judge will accept the sentencing "recommendations," much as occurred years ago when that great pillar of justice (Hah!) Moise Berger's ban on plea bargaining begat submissions in which lawyers and judges agreed to the disposition of cases behind closed doors. Or else counsel will ask the court to defer acceptance of the plea until they find out if the court will go along with the sentencing "recommendation."

I have no idea whether there would be a significant increase in the trial rate in Maricopa County with the proposed amendment, and as several judges have expressed, that may not be a bad result *if* we had the resources to absorb an increase. At this point we simply don't, unless it comes at the expense of the other divisions of the court, or health care, education, parks, or what have you. That's not the justice system's fault, but rather the reality of the budget crisis in Maricopa County and past poor fiscal management. But in any case a 5 to 6% *jury* trial rate is common to most other metropolitan court systems. The higher trial rates seen in other metropolitan jurisdictions (other than Pima County) are from a much higher degree of bench trials which by local legal culture are practically nonexistent in Maricopa County, or this state.

As is mentioned in Appendix C of the Petition, sentencing stipulations have been rejected in about 9% of the cases in Maricopa County. Yet that doesn't include the numerous other cases where the court informs the parties it can't agree to the stipulation, but then informs them what would be acceptable. Most of those cases are then settled without a formal rejection. In many divisions this occurs on a daily basis. Having done this on a regular basis for years, rejecting some pleas as too harsh and some as too lenient, I can count on one hand the number of cases where the parties didn't accept my decision.

Many cases simply require a stipulated sentence. As Presiding Criminal Judge in Maricopa County I supervise the State and County Grand Juries. On a fairly regular basis I take preindictment pleas in cooperation agreements in major fraud and white collar crime cases, public corruption cases, multi-defendant wiretap conspiracy cases and the like. Without the ability to stipulate to a sentence many of those agreements which serve justice usually would not be reached.

Other types of cases which *sometimes* warrant a stipulation as to sentence are those involving dangerous crimes against children, complex cases that if tried would last weeks or months, and many cases which come before us as trial judges where a stipulated plea at least to probation or prison is in the interests of justice.

To have a rule which in effect ties the court's and the parties' hands by an absolute prohibition on all sentencing stipulations puts the court in the same position as some prose-

cutors who develop policies that are seen as absolutes or some mandatory sentence provisions which produce results in selected cases that none of the parties even believe are just. Our system should not deal in absolutes when we are talking about real people as defendants and victims.

One of the most troubling arguments in favor of the petition is that sentencing stipulations reduce or eliminate sentencing advocacy and that they add to delay. My only response to that is that judges get what they demand of attorneys. If attorneys know and let their clients know that a judge doesn't decide what the sentence should be or whether to accept or reject a plea until counsel, the defendant, and the victim have had their say in court, it promotes not only advocacy but respect. If judges merely act as "rubber stamps" through laziness or an unwillingness to "rock the boat," perhaps they should seek other employment.

The bottom line is that some judges need to be able to "Just say No!" if they don't agree with a stipulation. I totally agree with the comments of Jon Sands for the Criminal Justice Section of the State Bar that "a refusal to determine if a plea is in the interests of justice for fear of rocking the boat is a sad commentary on the bench." Likewise it is imperative that judges not willy-nilly grant thirty day continuances without good cause.

The fact of the matter is that most plea agreements are not objectionable. As a judge commands respect, in fact, he or she will see fewer stipulated sentences. Judges who see themselves as mere functionaries and who don't exercise their authority and control in a judicious manner cannot command respect.

As an alternative to the Petition, I believe that three modifications to the current rule would improve the system. First, that stipulations be allowed to probation or prison, but not as to the terms of probation or the number of years in prison except in exceptional circumstances. Second, that there not be an automatic change of judge once a plea

is rejected. This only serves to promote judge shopping. Finally, judges should be allowed to participate in settlement discussions with counsel so long as that judge is not the trial judge (unless the parties agree the judge should try the case as well.) While I realize these alternatives open up a different can of worms again, they are ideas which warrant consideration.

Respectfully submitted this 19th day of SEPTEMBER, 1994.

/s/ Ron Reinstein
Ron Reinstein