994 P.2d 1019

**In re JONAH T.**

**In re Jacob W.**

Nos. 1 CA–JV 98–0251, 1 CA–JV 98–0256.

Court of Appeals of Arizona,
Division 1, Department E.

Sept. 16, 1999.

Review Denied Feb. 8, 2000.

Janet Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals, and Richard M. Romley, Maricopa County Attorney by Linda Alauria, Deputy County Attorney, and Patricia A. Nigro, Deputy County Attorney, Phoenix, Attorneys for Appellees.

Dean W. Trebesch, Maricopa County Public Defender by Suzanne Weschler Sanchez, Phoenix, Attorneys for Appellants.

## OPINION

VOSS, Judge.

¶ 1 We have consolidated these two juvenile appeals to address a common issue: what is the effect of the prosecution's noncompliance with an administrative order of the Arizona Supreme Court regarding drug testing on a juvenile court's discretion in probation revocation proceedings? In both of these cases, the evidence establishing violation of the juveniles' probationary terms included positive laboratory immunoassay urine test results indicating the juveniles' marijuana use. In both cases, the juveniles denied drug use. In both cases, although dispositions of detention or incarceration might have resulted, no confirmatory test by gas chromatography/mass spectrometry (GC/MS) was timely submitted, as required by the Arizona Supreme Court's *Administrative Requirements for Adult and Juvenile Probation and Pre–Trial Services Drug Testing*, Administrative Order No. 95–20, effective March 16, 1995 (Administrative Order 95–20).

¶ 2 In *Jacob W.*, the juvenile argued that noncompliance with Administrative Order 95–20 resulted in insufficient evidence to support the finding that he violated his probation. In *Jonah T.*, although the juvenile received no detention or incarceration as disposition, he argued that noncompliance with Administrative Order 95–20 warranted dismissal of the petition to revoke probation.[1] Both juveniles challenge the admissibility of the positive immunoassay urine tests as unreliable in the absence of the required GC/MS confirmatory test results. In *Jacob W.*, the juvenile also challenges the discretion of the juvenile court to impose a disposition that included detention.

¶ 3 We conclude that noncompliance with Administrative Order 95–20 does not preclude admission of positive immunoassay urine test results as unreliable, nor does it affect the juvenile court's discretion in determining the appropriate disposition in probation revocation proceedings.

## FACTS AND PROCEDURAL BACKGROUND

*In re Jacob W.*

¶ 4 The state petitioned to revoke the juvenile's probation alleging, in relevant part, that the juvenile had tested positive in an immunoassay urine test for marijuana use on two occasions. The juvenile denied any drug usage. At the violation hearing, defense counsel objected to admission of the immunoassay urine test results because the state had failed to conduct a confirmatory GC/MS test as required by the drug testing policies and procedures adopted by Administrative Order 95–20. Defense counsel also objected to the juvenile's detention as violative of Administrative Order 95–20.

¶ 5 At the disposition hearing, after finding that the juvenile had violated the terms of his probation, the juvenile court ordered the juvenile detained for 30 days, followed by two months of weekend detention. The juvenile timely appealed.

*In re Jonah T.*

¶ 6 The juvenile was charged with violating his probation after testing positive for marijuana on three occasions, as evidenced by positive immunoassay urine test results. The juvenile denied using drugs. At the violation hearing, the prosecutor brought to the court's attention the fact that defense counsel had advised her that the case might need to be dismissed based on noncompliance with Administrative Order 95–20, and the following discussion ensued:

> [PROSECUTOR]: Your Honor, ... there is an administrative order from the Supreme Court dating back to 1995 that seems to require ... a GCMS test when a juvenile tests positive to drug use and denies that he's using drugs. I was not aware of this being relatively new to the office and I don't want to present an argument against it when it may very well in fact be the case.
>
> So at this time I would ask the Court for a continuance so that I can look into it, get some direction from my office, and it may be that we would need to dismiss the case.
>
> . . . .
>
> THE COURT: And obviously as well I'm not aware of the administrative order, so educate me.
>
> . . . .
>
> All right. GCMS is to be done in a situation where one is accused of using drugs and denies it?
>
> . . . .
>
> Is the taking of that GCMS test contingent upon a request of the juvenile or the juvenile's counsel to have the test done?
>
> [DEFENSE COUNSEL]: Not according to the way this reads.
>
> . . . .

---

1. In *Jonah T.*, we have reversed the disposition on other grounds, addressed in an unpublished memorandum decision filed concurrently with this decision. In *Jacob W.*, we have addressed the other issues raised on appeal and affirmed. In this opinion, we address only the effect of noncompliance with Administrative Order 95–20 on the admissibility of the immunoassay urine test results and the juvenile court's dispositional alternatives. *See* Rule 28(g), Arizona Rules of Civil Appellate Procedure (allowing partial publication).

THE COURT: ... Something seems odd. I mean it's certainly not uncommon that individuals—and I'm just speaking generally here—individuals deny drug use when test results would indicate otherwise, and that wouldn't seem to warrant an expensive re-testing in every case.

. . . .

Mr. Kern [the probation officer], unless you can shed some light on any of this, have you had any dealings with the GCMS test?

[PROBATION OFFICER]: Your Honor, up until this point in time—and we were talking about this with some other probation officers prior to the hearing—this evidently has just been brought to the surface by public defender's office on these kind of cases.

To my knowledge, the GSMC (sic) test is usually recommended by TASC if a juvenile tests positive for amphetamines because sometimes amphetamines can—or an amphetamine-type reading could be the result of some medication the juvenile might be taking, so that specific test can be requested by the probation department ... to decisively say it's amphetamines or no, it's not an antihistamine type. But for marijuana, the probation department has never been asking for that test every time we had a positive reading.

If that's something that procedurally needs to be changed or TASC needs to do that on every kid, I don't know. We haven't heard anything about that until today.

¶ 7 After defense counsel indicated he did not believe the state could meet its burden of proof to establish a probation violation without complying with Administrative Order 95–20, the court indicated it would grant a continuance, over objection of the juvenile, for the following reason:

THE COURT: Well, we could proceed with the adjudication. I could take it under advisement because as I indicated a moment ago, I'm not familiar with the administrative order and it doesn't make sense to me quite honestly that any time somebody says for any type of drug, "No, I didn't use anything," that you have to then take the next step and spend additional money for a more expensive test; however, I haven't looked at the administrative order to that end.

¶ 8 At the continued adjudication hearing, the court addressed what it considered to be the juvenile's motion to dismiss based on noncompliance with Administrative Order 95–20. The prosecutor argued:

If the GCMS test is a required procedure, then we're at—the State is at a loss as to how to address this because it appears to be an internal court administrative issue. If there needs to be a change to the contract between TASC and the Juvenile Court, that should probably be addressed.

The court remarked:

I felt ambushed. I didn't know that the issue was going to be raised, and I certainly wasn't familiar with the administrative order, and even looking at it now—it still doesn't make sense to me.

The court took the motion under advisement, and proceeded with the adjudication hearing. After finding that the juvenile had violated the terms of his probation, the court reinstated the juvenile on standard probation in the custody of his mother. The juvenile timely appealed, arguing, in part, that the evidence was insufficient to find the juvenile in violation of his probation without the confirmatory GC/MS test as required by Administrative Order 95–20.

## DISCUSSION

*Scope of The Administrative Order*

¶ 9 The drug testing policies and procedures adopted pursuant to Administrative Order 95–20 set forth, in part, the following general procedures for drug testing:

The initial laboratory test shall be an immunoassay meeting the requirements of the Food and Drug Administration for commercial distribution for those drugs which can be detected by an immunoassay technique.

. . . .

The department/agency shall follow these procedures to confirm samples that

tested positive on an initial screening. The degree of required confirmation is dictated by: 1) the intended use of the results; and 2) the offender's admission or denial or related substance abuse.... The greater the likelihood of incarceration or imprisonment, the greater the need for the use of the most accurate confirmation test.

1. If the offender *admits* substance abuse that would explain the positive results of the initial screening, no confirmation is necessary. The officer may use the results and admission for court proceedings....

2. If the offender *denies* substance abuse, and the officer's use of the results is limited to administrative disciplinary action not resulting in a period of commitment, incarceration or imprisonment, the sample may be confirmed by a retest using the same technology or one of equal or greater sensitivity. *The results from this confirmation procedure cannot be used as the only evidence in a revocation proceeding which may result in incarceration or imprisonment.*

3. If the offender *denies* substance abuse and the results are to be used in court proceedings, the sample shall be retested by Gas Chromatography/Mass Spectrometry (GC/MS).

....

(Emphasis in original; italics added.) These policies and procedures clearly apply to juvenile court proceedings pursuant to Administrative Order 95–20.

¶ 10 Both juveniles argue that noncompliance with these policies and procedures in performing required confirmatory testing by GC/MS when the juvenile has tested positive by immunoassay but has denied drug use mandates that the initial urine test results be considered inadmissible as unreliable in "a revocation proceeding which may result in incarceration or imprisonment." We disagree that this was either the intent or is the substantive effect of Administrative Order 95–20.

¶ 11 The Arizona Supreme Court has "administrative supervision over all the courts of the State." Ariz. Const. art. 6, § 3. This provision contemplates general management of the conduct of court personnel. *See In re Shannon,* 179 Ariz. 52, 76, 876 P.2d 548, 572, modified, 181 Ariz. 307, 890 P.2d 602 (1994). "Administrative," within the meaning of this constitutional provision, has been defined as follows:

Connotes of or pertains to administration, especially management, as by managing or conducting, directing, or superintending, the execution, application or conduct of persons or things. Particularly, having the character of executive or ministerial action. **In this sense, administrative functions or acts are distinguished from such as are judicial.**

*Id.,* quoting *Black's Law Dictionary* 42 (5th ed.1979) (emphasis added).

¶ 12 The Arizona Supreme Court also has the "[p]ower to make rules relative to all procedural matters in any court." Ariz. Const. art. 6, § 5. This authority extends to promulgation of rules of procedure for juvenile matters. *Maricopa County Juv. Action No. J–84536–S,* 126 Ariz. 546, 547, 617 P.2d 54, 55 (App.1980). Generally, an administrative order may not conflict with the procedural rules adopted by the supreme court. *See JV–132324 v. Superior Court,* 181 Ariz. 337, 344, 890 P.2d 632, 639 (App.1995).

¶ 13 Pursuant to its constitutional rule-making power, *see* Ariz. Const. art. 6, § 5, the Arizona Supreme Court has adopted the Rules of Evidence. *State ex rel. Collins v. Seidel,* 142 Ariz. 587, 590, 691 P.2d 678, 681 (1984). Any change to or effect upon the admissibility of evidence as established by these evidentiary principles requires promulgation of a rule or a statute not inconsistent with existing rules. *See Maricopa County Juv. Action No. JS–501904,* 180 Ariz. 348, 353, 884 P.2d 234, 239 (App.1994). A general "policy" adopted by judges, even as a legitimate experiment, requires promulgation of a supreme court rule to be effectively enforced. *See Espinoza v. Martin,* 182 Ariz. 145, 149, 894 P.2d 688, 692 (1995).

¶ 14 Administrative Order 95–20 authorized the Administrative Director of the Courts to distribute certain policies and procedures regarding drug testing to "all presid-

ing superior court judges, all presiding juvenile court judges, all chief adult probation officers, all directors of juvenile courts, and all pre-trial services directors" within seven days of its effective date. Regarding enforcement and compliance, the administrative order provided as follows:

Each probation department and pre-trial services agency will develop and implement drug testing policies and procedures consistent with this Order and the Adult and Juvenile Probation and Pre–Trial Services Drug Testing Policies and Procedures (established by the Director). The presiding judge must review and approve each department's or agency's testing policies and procedures. A copy will then be filed with the respective probation division at the AOC. The Chief Probation Officer or Juvenile Court Director, or Pre–Trial Services Director, or his or her designee, will be responsible for the department's or agency's compliance with established policies and procedures.

Nothing in the administrative order addressed the effect of noncompliance with the drug testing policies and procedures on the admissibility of drug test results or on the juvenile court's discretion in choosing among dispositional alternatives in probation revocation proceedings.

¶ 15 Under the Arizona Rules of Procedure for the Juvenile Courts (Juvenile Rules), a juvenile charged with a probation violation who denies that allegation is entitled to a violation hearing. Juvenile Rule 10.4(d). At that hearing, the following procedures apply:

A violation must be established by a preponderance of the evidence. Each party may present evidence and shall have the right to cross-examine witnesses who testify. *The court may admit any reliable evidence not legally privileged, including hearsay.*

Juvenile Rule 10.4(g)(emphasis added). Pursuant to the Arizona Rules of Evidence (Evidence Rules):

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of Arizona, or by applicable statutes or rules....

Evidence Rule 402. Constitutional principles require that scientific hearsay evidence be "reliable," according to a standard of general acceptance of a scientific process or principle in the relevant scientific community. *State v. Velasco,* 165 Ariz. 480, 486, 799 P.2d 821, 827 (1990) (citing *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)). Arizona courts have consistently found that a urinalysis report is reliable evidence in a criminal proceeding.[2] *State v. Tulipane,* 122 Ariz. 557, 559, 596 P.2d 695, 697 (1979); *State v. Rivera,* 116 Ariz. 449, 451, 569 P.2d 1347, 1349 (1977); *State v. Snider,* 172 Ariz. 163, 164, 835 P.2d 495, 496 (App.1992); *State v. Flores,* 26 Ariz. App. 400, 401, 549 P.2d 180, 181 (1976). The determination whether evidence is reliable in a specific case is left to the sound discretion of the juvenile court. *Maricopa County Juv. Action No. J–83341–S,* 119 Ariz. 178, 183, 580 P.2d 10, 15 (App.1978).

¶ 16 The juveniles assert that noncompliance with the policies and procedures mandated by Administrative Order 95–20 is analogous to noncompliance with the Arizona Department of Health (DHS) regulations promulgated to assure reliability of breath samples in DUI cases. In DUI cases, breath tests conducted in noncompliance with DHS regulations have been deemed unreliable, and therefore inadmissible, in criminal proceedings. *See, e.g., State v. Harrison,* 157 Ariz. 184, 186, 755 P.2d 1172, 1174 (App.1988).

¶ 17 We do not find the DUI cases analogous. In 1984 the Arizona legislature specifically amended the DUI statute, A.R.S. § 28–692.03, to require that a law enforcement agency show compliance with certain DHS regulations as a foundational requirement for admission into evidence of breath tests results. *Id.* Thus, compliance with the DHS regulations is a prerequisite for admissibility

---

**2.** In the civil context, we have recognized that the enzyme-multiplied immunoassay test (EMIT) "has a margin of error of approximately 5% for marijuana," while the confirmatory test by GC/MS "has a reported accuracy rate of 99.99%." *Weller v. Arizona Dept. of Econ. Sec.,* 176 Ariz. 220, 222, 860 P.2d 487, 489 (App. 1993).

in this limited area, and the remedy for noncompliance is suppression of the test results. *Id.* No similar legislation has been enacted to govern or limit admissibility of immunoassay urine tests as evidence of drug use in juvenile probation revocation proceedings. We do not interpret the policies and procedures adopted in Administrative Order 95–20 as rising to the level of statutorily authorized DHS regulations, under these circumstances. We therefore conclude that the immunoassay urine tests for marijuana use were admissible as reliable evidence, even absent the confirmatory GC/MS tests required by Administrative Order 95–20.

¶ 18 Regarding disposition, we note that the juvenile court is empowered by statute with discretion to award a delinquent child to the Arizona Department of Corrections for detention. *See* A.R.S. § 8–341, subd. A, par. 1(e). The juvenile court may proceed to this disposition in a probation revocation proceeding following a finding that the juvenile has violated the probationary terms. Juvenile Rule 10.4(k). We find no authority for the proposition that this statutory and rule-imposed judicial discretion can be limited by an administrative order directed to administrative court personnel. Thus, we conclude that the juvenile court had discretion to include detention or incarceration as a dispositional alternative in these cases, regardless of noncompliance with the drug testing policies and procedures set forth in Administrative Order 95–20.

¶ 19 According to the AOC memorandum that accompanied the distribution of Administrative Order 95–20, the policies and procedures set forth therein were authored by the American Probation and Parole Association in 1991 as guidelines to apply to drug testing in the criminal justice setting. The stated purpose was "to establish minimum drug testing standards modeled after the APPA monograph and which fits the needs of the court system in Arizona." The memorandum noted that, since federal workplace testing program guidelines were established in 1988,

"the drug war effort has dramatically increased the use of drug testing in community correction settings." Because drug testing results "can impact the liberty of offenders under court supervision," the policies and procedures were adopted as "uniform procedures which can stand up to court tests."

¶ 20 This administrative order, obviously well-researched and laudable in purpose, was intended to direct the appropriate court administrative personnel to establish uniform testing procedures. It did not, however, constitute a "rule of court," which would prescribe a procedural course of conduct that could deprive the parties of substantive rights for noncompliance. *See Espinoza v. Martin,* 182 Ariz. at 149, 894 P.2d at 692. Before they could be applied to suppress evidence or restrict dispositional alternatives, the policies and procedures set forth in Administrative Order 95–20 would have to be adopted as a court rule by the Arizona Supreme Court under its rule-making authority.[3]

## CONCLUSION

¶ 21 In summary, we find no authority that would allow an administrative order to govern, or conflict with, the rules of admissibility of otherwise reliable evidence or to limit the statutory discretion afforded the juvenile court in dispositional alternatives in a juvenile probation revocation proceeding. The policies and procedures adopted by Administrative Rule 95–20 were directed at administrative court personnel, with enforcement placed in the hands of court administrators, not trial judges. We find no constitutional or statutory basis to construe Administrative Order 95–20 as affecting a substantive change in the law. We therefore conclude that Administrative Order 95–20 did not preclude the admission of the immunoassay urine tests in these cases, nor did it limit the juvenile court's dispositional alternatives, even in the absence of a confirmatory GC/MS test.

---

3. We note that the rule-making process includes the protections of public comment by the bench and bar, which does not generally accompany the issuance of an administrative order. *See id.* at 152, 894 P.2d at 695 (Feldman, J., concurring) ("It is essential, we believe, to appropriately consider practitioners' views of the vicissitudes of daily practice under the proposed change.").

CONCURRING: WILLIAM F. GARBARINO, Presiding Judge, and THOMAS C. KLEINSCHMIDT, Judge.