

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 25S-JD-80



FILED

Mar 19 2026, 1:59 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## In the Matter of the Honorable
## J. Steven Cox, Judge of the
## Franklin Circuit Court,
*Respondent.*

Decided: March 19, 2026

Judicial Discipline Action

Hon. Matthew E. Sarber,
Hon. Marianne Vorhees, and
Hon. Kelsey Hanlon,
Special Masters

**Per Curiam Opinion**

Chief Justice Rush concurs.

Justice Molter concurs with separate opinion in which Justice Massa and
Justice Slaughter join.

Justice Goff did not participate in the decision of this matter.

**Per curiam.**

This matter is before us on the Indiana Commission on Judicial Qualifications' ("Commission") "Notice of the Institution of Formal Proceedings and Statement of Charges" ("Complaint") against Respondent, the Honorable J. Steven Cox, former Judge of the Franklin Circuit Court. After considering the evidence, the Special Masters' report, and the parties' arguments, we find that Respondent committed judicial misconduct by engaging in—and relying on—ex parte communication with the criminal defendant in a Level 1 felony case. We also agree that this egregious misconduct warrants the most serious discipline we can impose on a judge who no longer holds elected office: Respondent's permanent ban from judicial service and a public reprimand.

Chief Justice Rush would also find that Respondent violated our Code of Judicial Conduct by implementing a de facto policy of denying negotiated plea agreements, but the other three participating Justices would stop short of deciding whether such a policy is an ethical violation. *Ante*, at 1.

# Procedural Background

On April 3, 2025, the Commission filed its Complaint against Respondent, which it later amended to correct a clerical error. The Complaint alleged three counts of misconduct: Respondent (1) engaged in ex parte communication while presiding over a Level 1 felony criminal case, *State v. Guilfoyle*; (2) relied on that ex parte communication to rule on issues in the case; and (3) implemented a de facto policy of rejecting all written plea agreements. With the Court's permission, Respondent filed a belated answer, and on June 23, we appointed three Special Masters to preside over the case.

With no agreement reached and after several continuances, the parties convened on September 30, 2025, for a final evidentiary hearing. On November 14, the Masters issued their 45-page report. They concluded that the Commission had carried its burden of proof as to all charged counts and rule violations.

But the Masters declined to recommend a sanction. *See* Admis. Disc. R. 25(VIII)(N)(2). On December 2, the Commission filed its response to the Masters' report, wherein it recommended that this Court adopt the Masters' findings wholesale and impose a public reprimand and six-month prohibition on Respondent's ability to hold judicial office. Respondent petitioned for review, challenging the Masters' conclusions. He argued that his actions did not violate any ethical rules, so we should decline to impose a sanction. The Commission filed its reply on December 31, rendering the case fully briefed for our consideration.

# Discussion

Respondent argues that his conduct did not violate any ethical rules, and, regardless, his retirement from office and the bar renders this case moot. We disagree with both assertions. We adopt the Masters' findings as summarized below. And we explain how Respondent's misconduct violated various Rules of Judicial Conduct, meriting a significant sanction.

## I. Facts
### a. *State v. Guilfoyle*

Respondent was admitted to the bar in 1990 and began serving as the elected judge of the Franklin Circuit Court on January 1, 1995. He presided over major felony cases, from Level 4 felonies to murders. He retired from that office on December 31, 2024.

On December 23, 2022, Gregory Guilfoyle exchanged gunfire with law enforcement and sustained life-threatening injuries. That same day, the Franklin County prosecutor filed two counts of Level 1 felony attempted murder and one count of Level 6 felony neglect of a dependent against Guilfoyle in case number 24C01-2212-F1-879 ("Case 879"). Respondent presided over the case between December 2022 and February 2024. Due to Guilfoyle's severe injuries, the parties disputed whether he should be detained while awaiting resolution of his case.

On January 11, 2023, Guilfoyle's counsel ("McMillen") filed a "Motion for Psychiatric Evaluation" to address concerns that Guilfoyle was not

competent to stand trial. Respondent presided over a hearing on counsel's motion on January 18. At that time, Respondent released Guilfoyle from custody on his own recognizance with the condition that Guilfoyle be placed on home detention at his parents' house. Respondent ordered probation to make weekly visits to the house and report back to the court as to Guilfoyle's health. But Respondent did not rule on McMillen's motion for an evaluation.

On January 23, McMillen filed a "Motion to Authorize Defendant to be Transported to Medical Facilities While on In-Home Detention," which Respondent granted the following day. Meanwhile, Chief Probation Officer Brian Campbell visited Guilfoyle on January 19 and January 25. On January 26, Campbell filed a report regarding Guilfoyle's physical abilities and medical condition. That same day, Campbell spoke directly with Respondent at the courthouse. Respondent told Campbell to take him to Guilfoyle. Respondent felt he had a responsibility to know the home's condition to ensure the placement was appropriate and to protect himself and the court from liability.

So Campbell went back to Guilfoyle's parents' home on January 26, this time with Respondent. Respondent did not notify any party as to the impending visit. Respondent spoke with Guilfoyle's father and mother in Guilfoyle's presence regarding Guilfoyle's physical and mental wellbeing. Respondent also spoke directly with Guilfoyle and asked him questions.

Later on January 26, Respondent issued a sua sponte order authorizing Guilfoyle's in-home detention providers to transport him to a medical facility. Respondent premised his order on Campbell's filed report, an email with Campbell, and the "subsequent in-person inspection of the in-home detention residence by the Court." The prosecutor assigned to the case later testified that he did not understand Respondent's order to mean that Respondent spoke with Guilfoyle. Respondent did not set a hearing on his order.

Campbell later wrote an internal report, which described the January 26 conversation in the home as including "lengthy explanatory discussions about [Guilfoyle's] physical and mental health and the concerns and

objectives of the Court." Campbell did not share the report with the other parties.

On February 3, 2023, McMillen renewed his motion for a psychiatric evaluation. Respondent held a hearing on the motion on February 15 and took the matter under advisement. A few days later, McMillen filed a "Notice of Intent to Interpose the Defense of Insanity." Respondent then held a hearing on March 29 where he addressed McMillen's pending motions. Respondent stated:

> Of course, the court isn't either equipped, or schooled[,] or certified in evaluation of a person's mental condition. But I will note for the record that on that date, when the court went to personally observe the accounts that were being given to the court about why emergency care was necessary, the Defendant on that date was able to understand and answer the court's questions with regard to his physical situation. And at least on that date, was not having this exhibiting [sic] the same kinds of characteristics that have been reported by his caregivers and family with regard to his mental state, at other times.

Respondent would later deny McMillen's renewed motion for a psychiatric evaluation, supplements, and notice of intent to interpose insanity defense in a written order, writing:

> Based on the Court's observation of the Defendant during his pretrial release in the supervising home as well as his appearance remotely for his Initial Hearing held April 5, 2023, the Court FINDS that there are no reasonable grounds to believe that the Defendant has an insufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or has no present ability to formulate a rational as well as functional understanding of the proceedings against him.

When McMillen filed a "Renewed Motion for Competency and Insanity Evaluations Pursuant to Original Action 2," Respondent denied it for the "reasons already stated by the court[.]" McMillen asked the court to certify that order for interlocutory appeal, which Respondent denied.

Although he granted McMillen's request to appoint two doctors to conduct an insanity evaluation, Respondent never authorized a competency evaluation.

### b. Plea Agreements

In August 2022, Respondent appeared before the Franklin County Council to discuss the Circuit Court's 2023 budget. Respondent told the council that (1) major felony cases had significantly decreased in Circuit Court 1; (2) the court should only use negotiated plea agreements to avoid backlogs; and (3) "I don't deal with plea agreements anymore" and to expect more trials and dismissals in 2023.

Beginning in the summer of 2022, Respondent routinely rejected plea agreements and set cases for trial without providing a rationale. Between July 2022 and December 31, 2024, Respondent did not accept any written plea agreements. Because Respondent rejected the proposed plea agreements, the State dismissed several cases, refiled them as lower-level felonies in other courts, and resolved the matters via written plea agreements in those courts. At some point, the Franklin County Prosecutor's Office stopped filing written plea agreements in Respondent's court.

Respondent told "all of the attorneys" who practiced in his court that he "wasn't going to fool with written plea agreements anymore[.]" Respondent advised two attorneys that he couldn't stop them from filing plea agreements, but he hadn't "been entertaining" them.

## II. Rule Violations
### a. Ex Parte Communication

Code of Judicial Conduct Rule 2.9(A) generally prohibits a judge from initiating, permitting, or considering ex parte communication. However, it contains an exception for "ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters[.]"

Respondent claims his communication with Guilfoyle fell under the administrative and emergency exceptions. He argues he reasonably

believed that an emergency existed requiring him to visit Guilfoyle in person. He points to Campbell's January 26, 2023, report for support. That report described Guilfoyle's "extreme amount of pain[,]" "paraly[sis] from the waist down[,]" "fractured rib[,]" and "open wound near his right leg" that continued "to leak bodily fluids."

But even assuming an emergency existed, Respondent fails to explain why he could not rely on Campbell's weekly reports to appropriately address the emergency. He also fails to acknowledge that the rule prohibits a judge from discussing "substantive matters," even if the ex parte communication is for administrative or emergency purposes. Respondent asked Guilfoyle and Guilfoyle's parents questions about Guilfoyle's health. And McMillen had filed several motions in Case 879 directly pertaining to Guilfoyle's health, both before and after Respondent visited the home.

Further, Judicial Conduct Rule 2.9(A)(1)(b) requires a judge who engages in ex parte communication for administrative or emergency purposes to "promptly notify all other parties of the substance of the ex parte communication" and give them an opportunity to respond. And Rule 2.6 requires judges to provide "every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." The record shows Respondent did not notify the parties that he spoke directly with Guilfoyle or of the substance of their conversation until two months later. We agree with the Masters that, under these circumstances, this was not sufficiently prompt for purposes of Rule 2.9. Thus, Respondent failed to provide the parties with their right to be heard as Rule 2.6 requires.

Finally, Rule 2.9(C) prohibits a judge from independently investigating facts and requires judges to consider **only** the evidence presented by the parties or facts that may be properly judicially noticed. *See* Rule of Evidence 201 (describing which facts may be judicially noticed, none of which apply here). Respondent made clear that his ex parte discussion with Guilfoyle factored into his decision to deny McMillen's motions for a psychiatric evaluation.

In sum, we agree with the Masters—who also found that this conduct violated Judicial Conduct Rules 1.2,[1] 2.2,[2] and 2.6[3]—that Respondent violated Rules 2.9(A)[4] and 2.9(C)[5] in connection with his handling of the *Guilfoyle* case.

### b. Plea Agreements

Respondent does not dispute that he had a two-year de facto policy of denying all written plea agreements regardless of the specific merits of each case. The Commission charged, and the Masters found, that this practice violates Judicial Conduct Rules 1.2 and 2.2.

Respondent does not believe that his blanket policy violated the Code. He correctly notes that judges have discretion to accept or deny plea agreements, *see Rodriguez v. State*, 129 N.E.3d 789, 794 (Ind. 2019), and that defendants do not have a constitutional right to plea bargain, *see Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).

The Masters found *In the Matter of Young* instructive. There, we disciplined the judge-respondent for imposing increased penalties against traffic-infraction litigants who exercised their trial rights to penalize them and discourage others from doing so. In accepting the parties' conditional

---

[1] "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Jud. Cond. R. 1.2.

[2] "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially. A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of all litigants, including self-represented litigants, to be fairly heard." Jud. Cond. R. 2.2.

[3] "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Jud. Cond. R. 2.6(A).

[4] "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter," with exceptions inapplicable here. Jud. Cond. R. 2.9(A).

[5] "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." Jud. Cond. R. 2.9(C).

agreement, we held that the judge-respondent failed "to consider the specific circumstances of the cases before him when imposing penalties on defendants[.]" 943 N.E.2d 1276, 1280 (Ind. 2011). And although a judge has discretion when choosing the appropriate costs and fees to impose on a defendant, *see Spells v. State*, 225 N.E.3d 767, 771 (Ind. 2024), we still found that Judge Young's practice violated the Code of Judicial Conduct.

Chief Justice Rush has similar concerns with Respondent's policy here. Respondent also failed to consider the specific circumstances of each case before him. He forced all defendants in his court to either plead open or proceed to trial, despite Indiana law expressly authorizing plea agreements. Not only did Respondent's policy delay cases and waste resources, it gave the appearance of a patchwork judicial system in which defendants' rights vary depending on which court hears their cases.

But for reasons explained in the concurring opinion, the other participating Court members would decline to reach this issue in the context of this proceeding. At the end of the day, our different views on Count 3 ultimately do not alter our unanimous conclusion regarding the sanction merited by Respondent's misconduct.

### III. Sanction

Having found that Respondent's misconduct violated various rules, we are left with the task of determining an appropriate sanction.[6]

This Court may impose a variety of sanctions for judicial misconduct, including limitations or conditions on the performance of judicial duties. *See* Admis. Disc. R. 25(IV). Judicial discipline proceedings are not only remedial in nature but also intended to preserve the integrity of and public confidence in the judicial system. *Matter of Hawkins*, 902 N.E.2d 231,

---

[6] As mentioned, Respondent retired from office in December 2024. He then retired from the practice of law in November 2025, after the final hearing in this matter. He urges us to find the case moot and to decline to impose a sanction due to his voluntary retirement. Because Respondent can seek reinstatement and subsequently serve as a senior judge or judge pro tempore, *see* Admis. Disc. R. 2(e), we decline to find the case moot. Thus, we address the appropriate sanction.

244 (Ind. 2009). Sanctions are "designed to deter similar misconduct and assure the public that judicial misconduct will not be condoned." *Matter of Young*, 92 N.E.3d 628, 634 (Ind. 2018).

We may consider aggravating and mitigating factors offered by the parties when arriving at a sanction. *In the Matter of Brown*, 4 N.E.3d 619, 628 (Ind. 2014). Here, the Commission offers several aggravating factors:

- Respondent's misconduct prejudiced the administration of justice.
- Respondent's misconduct caused actual harm to the parties in *State v. Guilfoyle*.
- Respondent has shown a lack of insight regarding the impact of his misconduct.
- Respondent has prior discipline—specifically, three private cautions and a public Commission admonition.

We find these factors persuasive. Despite having been previously cautioned for inappropriate ex parte communication, Respondent maintains that his in-person visit and discussion with Guilfoyle did not violate Rule 2.9. This demonstrates a fundamental misunderstanding of— or blatant disregard for—what that rule requires.

Respondent proffers two potential mitigators, but the first is the mootness argument we rejected above and the second is his cooperation with these proceedings, which Admission and Discipline Rule 25(J)(1) requires of all judges.

Most judicial discipline cases involving singular instances of ex parte communication resulted in either public reprimands or short active suspensions as agreed upon by the parties. *See*, *e.g.*, *Matter of Sanders*, 674 N.E.2d 165 (Ind. 1996) (7-day suspension); *Matter of Jacobi*, 715 N.E.2d 873 (Ind. 1999) (3-day suspension); *Matter of Meade*, 200 N.E.3d 448 (Ind. 2023) (7-day suspension). Indeed, in *Meade*, we opined, "[W]e cannot overlook the fact that we are considering this matter following the parties' submission of a conditional agreement. Such agreements are often the product of lengthy negotiations and **may merit a less severe sanction**

**than might otherwise be imposed after a trial on the merits**." 200 N.E.3d at 451–52 (internal citations omitted) (emphasis added).

But the breadth of Respondent's misconduct exceeds that at issue in *Sanders*, *Jacobi*, and *Meade*. The Commission has disciplined Respondent on four previous occasions, including twice for engaging in ex parte communication. And this case is not before us because the parties reached an agreement. Rather, Respondent held the Commission to its burden of proof in an all-day hearing, after which three Masters found that Respondent violated Rules 1.2, 2.2, 2.6, 2.9(A), and 2.9(C). Despite this, Respondent continues to deny any wrongdoing.

We cannot suspend Respondent because he is no longer on the bench. But for the foregoing reasons, we believe that preserving the integrity of the judiciary and ensuring the fair administration of justice require us to impose the maximum sanction available under the circumstances—a public reprimand and permanent ban from serving as a judicial officer.

# Conclusion

Due to his egregious misconduct, the Honorable J. Steven Cox is hereby publicly reprimanded and permanently banned from judicial service. As of the date of this opinion, he will no longer be eligible for judicial service, including as a judge pro tempore or senior judge. The Special Masters appointed in this case are discharged, and the Court commends them for their conscientious service in this matter.

Rush, C.J., concurs.
Molter, J., concurs with separate opinion in which Massa and Slaughter, JJ., join.
Goff, J., did not participate in the disposition of this matter.

ATTORNEYS FOR RESPONDENT

Garrett R. Bascom

Jefferson C.M. Kisor

Bascom & Kisor, LLC

Lawrenceburg, Indiana

ATTORNEYS FOR INDIANA COMMISSION ON
JUDICIAL QUALIFICATIONS

Adrienne L. Meiring, Counsel to the Commission

Stephanie K. Bibbs, Deputy Director of Litigation

Victoria H. Thomas, Staff Attorney

Mark R. Conner, Staff Attorney

Indianapolis, Indiana

**Molter, J., concurring.**

I agree with the Court's decision to adopt the special masters' findings and conclusions as to Counts I and II, which relate to the judge's ex parte communications. And given his past disciplinary history, I also agree with the Court's reprimand and foreclosure of a return to post-retirement judicial service. That is enough to resolve this matter, so we can stop there, short of adopting the special masters' conclusions for Count III.

For Count III, the special masters concluded the judge violated the Code of Judicial Conduct by adopting a de facto policy of rejecting one category of plea bargains—sentence bargains with stipulated sentences, sometimes called "fixed pleas." Chief Justice Rush agrees with the Commission and special masters that the policy violated rules requiring fairness and impartiality, which may be right. But I'm not yet convinced, and we don't need to decide the question here, so I conclude we should leave it for another day.

My hesitation in unnecessarily answering this question here is twofold. One concern is lingering doubt that the Commission carried its burden to show a rule violation by clear and convincing evidence. A related concern is that a trial judge's role in reviewing plea agreements is fraught, so we should hesitate to discipline judges before we've given them clearer guidance through our other avenues for reviewing this sort of plea bargaining policy in these sorts of circumstances: direct appellate review or an original action for a writ of mandamus or prohibition.

Adding weight to these concerns, the Commission's primary criticism of the judge's policy is the policy's categorical, unyielding nature. But the record is undisputed that it is common for trial judges across the State to adopt categorical policies for rejecting plea agreements. Perhaps that just reveals that even some of our best judges are unknowingly violating the Code, or perhaps there are principled ways to distinguish their policies. Before we begin down the path of disciplining judges for their categorical approaches to plea bargaining, I'd like to gain a better view of where the path ends.

To further explain my concerns below, I begin by describing the limits of the judge's plea bargaining policy. Then I discuss my concerns with the Commission's arguments. And I conclude by identifying better avenues for reviewing this question of first impression.

## I.

"Plea bargaining" is an umbrella term that covers both "charge bargaining" and "sentence bargaining." 16A Ind. Prac., Criminal Procedure-Trial § 13.3 (2025). Charge bargaining is when the prosecutor agrees to dismiss counts in exchange for the defendant agreeing to plead guilty to others. *Id.* Courts tend to show more deference to charge bargaining because they view it as part of the executive functions of investigation and prosecution, which are largely ill suited to judicial review. *See United States v. Papke*, 149 F.4th 1169, 1181 (10th Cir. 2025) ("The zone of judicial discretion is ordinarily quite limited for charge bargains because charge bargaining is a province primarily for the exercise of prosecutorial—not judicial—discretion." (quotations omitted)); *see generally* Darryl Brown, *The Judicial Role in Criminal Charging and Plea Bargaining*, 46 Hofstra L. Rev. 63, 63–34 (2017) (explaining this view).

"Sentence bargaining" is different, and it takes a few forms. 16A Ind. Prac., Criminal Procedure-Trial § 13.3 (2025). One form involves the prosecutor agreeing to a sentence recommendation in exchange for the defendant pleading guilty. *See, e.g., Pannarale v. State*, 638 N.E.2d 1247, 1248 (Ind. 1994). The agreement may be that the prosecutor make no recommendation at all, recommend a particular sentence or range, or recommend particular terms, like alternatives to incarceration or concurrent rather than consecutive sentencing. Even if the judge approves the agreement, the recommendation does not bind the judge, who retains complete sentencing discretion. *Hedger v. State*, 824 N.E.2d 417, 420 (Ind. Ct. App. 2005), *trans. denied*.

Another form—the one at issue here—involves the parties stipulating to a particular sentence in exchange for the defendant pleading guilty, sometimes called a "fixed plea" agreement. *Rodriguez v. State*, 129 N.E.3d 789, 794 (Ind. 2019) (explaining that "a 'fixed' plea is one which specifies the exact number of years to be imposed for sentencing" (brackets and

quotations omitted)). A fixed-plea agreement binds the judge if the judge approves it, in which case the judge must enter the agreed-upon sentence. *Id.* Because fixed-plea agreements impinge on judicial rather than executive prerogatives, some judges are less deferential to those agreements. *See Papke*, 149 F.4th at 1181 (explaining that trial courts "enjoy considerable discretion in their consideration of sentence bargains because the imposition of sentence is a matter of discretion for the district court and the prosecution's role in sentencing bargains is strictly advisory" (quotations and citations omitted)); Jeffrey Bellin & Jenia I. Turner, *Sentencing in an Era of Plea Bargains*, 102 N.C. L. Rev. 179, 202 (2023) (explaining that "judges dislike these stipulated sentence agreements precisely because they attempt to restrict the judge's sentencing discretion" and that some judges complain the agreements "produce sentences that result from closed door negotiations with the executive branch rather than from a public hearing before an independent judge" (quotations omitted)).

A trial judge's discretion to later modify the sentence without the prosecutor's consent depends on the form of the bargain. Charge bargains and sentence bargains with only nonbinding sentencing recommendations leave the judge with discretion to later modify the sentence without the prosecutor's consent. *See Rodriguez*, 129 N.E.3d at 791 (holding that "courts may modify a sentence only if the new sentence would not have violated the terms of the valid plea agreement had the new sentence been originally imposed"). But fixed-plea sentence bargains foreclose that discretion. *Id.* (holding that the trial judge was "not authorized to modify the sentence imposed under Defendant's fixed-term plea agreement").

Here, the parties and special masters generally refer to the judge's policy on "plea bargaining," but his policy covered only one category of plea bargains—fixed-plea sentence bargains. All five of the plea agreements the Commission and special masters identified are in that form, and both the judge and the Commission's witnesses uniformly confirmed the judge only declined to approve fixed-plea sentence bargains; charge bargaining and sentence bargains with nonbinding sentence recommendations continued. *See* Tr. at 69 (judge's testimony that he continued permitting charge bargaining); *id.* at 134–35 (prosecutor's

testimony that the judge continued permitting charge bargaining); *id.* at 135–36, 169 (prosecutor's testimony that the State continued entering into plea agreements where the State agreed to make a particular sentencing recommendation); *id.* at 276–77, 285 (Guilfoyle's defense counsel's testimony that the judge's policy shifted sentence bargaining to charge bargaining).

The judge explained he had two primary reasons for adopting this policy for fixed-plea sentence bargains. First, he thought courts should use plea bargaining only for caseload management and that he could manage his caseload without accepting fixed-plea sentence bargains. And second, he did not want a fixed-plea sentence bargain to limit his ability to modify a defendant's sentence, where appropriate, in the future.

## II.

The Commission argues that the judge's categorical rejection of fixed-plea sentence bargains violated two rules in the Code of Judicial Conduct. The first is Rule 1.2, which provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Ind. Judicial Conduct R. 1.2. The second is Rule 2.2, which provides:

> A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially. A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of all litigants, including self-represented litigants, to be fairly heard.

Jud. Cond. R. 2.2. These are "rules of reason that should be applied consistent with constitutional requirements, statutes, other court rules, and decisional law, and with due regard for all relevant circumstances." Jud. Cond. Scope cmt. 5. They are not to "be interpreted to impinge upon the essential independence of judges in making judicial decisions." *Id.* And in judicial discipline proceedings, the Commission has the burden to

prove with clear and convincing evidence that the judge violated these rules. *In re Young*, 92 N.E.3d 628, 632–33 (Ind. 2018).

The Commission doesn't analyze these rules separately; it argues that in tandem they required the judge to "allow for the consideration of the specific circumstances of cases before him," and his categorical approach to fixed-plea sentence bargaining did not reflect the "impartiality and open-mindedness" the rules require. Commission's Tender of Proposed Findings at 33–34, ¶ 125. The Commission further faults the judge for placing "his policy views about how the criminal justice system should operate above other participants in the system." *Id.* at 34, ¶ 126.

There is force to some of these arguments, and as I note below, some have led other courts to conclude judges abused their discretion by imposing categorical rules for rejecting plea agreements (although I have not found any decisions in the context of judicial discipline). But a few concerns give me pause.

A.

First, while the Commission faults the judge for placing "his policy views about how the criminal justice system should operate above other participants in the system," *id.*, our system compels trial judges to do that, at least to some degree. Review of plea bargains is not analogous to civil settlements. Generally, when parties settle a civil case, the judge has no role in approving their deal and is not even informed of the terms. (There are narrow exceptions, like class action settlements, which judges screen because the agreements bind absent class members.) If a settlement is tilted too far towards one party, or one party has been too heavy handed, the judge has no ability to intervene and reject the deal.

In criminal cases, though, our legislature requires judges to screen felony plea agreements, which the judges can reject. Ind. Code § 35-35-3-3. Judges are given very little guidance about what they can or are supposed to consider as well as what weight to give those considerations. *Cf. United States v. Wilmore*, 282 F. Supp. 3d 937, 938, 941 (S.D. W. Va. 2017) (noting that the federal rules task district judges with screening plea agreements but do not tell judges what they "should or may" consider, and "[o]ther

than granting the court broad discretion to accept or reject a plea agreement, Rule 11 provides no further guidance for the court"); Fed. R. Crim. P. 11 advisory committee's note to 1974 amendment ("The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement."). But their considerations can be gleaned from the purposes of their review, and there are at least a few reasons judges are tasked with this screening. One is that the agreements may intrude on the judge's sentencing discretion, so judges are empowered to reject agreements that would compel them to impose a sentence they deem inappropriate. *State v. Montiel*, 122 P.3d 571, 575 (Mont. 2005); *United States v. Bean*, 564 F.2d 700, 703–04 (5th Cir. 1977); Albert W. Alschuler, *The Trial Judge's Role in Plea Bargaining, Part I*, 76 Colum. L. Rev. 1059, 1074 (1976). Another is so that judges can protect defendants from the State's coercive power in a system that prioritizes plea bargaining. *See Daniels v. State*, 453 N.E.2d 160, 164–65 (Ind. 1983) ("In criminal cases, the court must protect a defendant from the power of coercion and abuse of the state . . . ."); *see generally* Dylan R. McDonough, Note, *In the Shadow of the Bench: Judicial Discretion to Reject Plea Agreements*, 57 Colum. J.L. & Soc. Probs. 633, 645–47 (2024); Rishi Raj Batra, *Judicial Participation in Plea Bargaining*, 76 Ohio St. L.J. 565, 584–86 (2015). And yet another reason is so judges can ensure the bargain appropriately protects the public's interests, including by ensuring the punishment reflects the gravity of the offense and appropriately mitigates the risk of future criminal behavior. *See, e.g.*, *Daniels*, 453 N.E.2d at 164–65 ("In criminal cases, the court . . . must also protect the interests of other members of our society in living in a peaceful, orderly atmosphere.").

Any time a judge exercises their discretion to reject a plea agreement for these reasons, they are, as the Commission puts it, elevating their own policy views about how the criminal justice system should operate over other participants in the system. Bellin & Turner, *supra*, at 202 (explaining that judges reject plea agreements "for a range of reasons, including that the agreement does not adequately reflect the seriousness of the offense, unduly cabins the judge's sentencing discretion, or is contrary to the sound administration of justice" (quotations omitted)). When a judge rejects a plea agreement because it's too late (e.g., the jury trial has already

started) or lenient, for example, the judge is elevating their own view of how the criminal justice system should operate over the views of the prosecutor, the defendant, and maybe even the victim. That elevation is appropriate at the policy level too. The prosecutor decides what charges are appropriate. But when local judges and local prosecutors have differing policy views about the appropriate punishments within statutory ranges for the crimes prosecutors charge—e.g., driving while intoxicated, drug crimes, violent crimes, or property crimes—the judges' views about punishment trump the prosecutors' views.

I suspect what the Commission may really mean is that judges shouldn't ignore the parties' views, which is true. But unless we or the legislature change the judge's role in screening plea agreements, the judge's views remain elevated above the views of others.

B.

Second, one of the Commission's key concerns is the categorical nature of the judge's approach, but the undisputed evidence is that it is common for Indiana trial judges to have categorical approaches for rejecting plea agreements. One of the Commission's witnesses—Guilfoyle's defense counsel who is also a former state legislator—testified that judges around the State reject plea bargains after they "adopt wholesale patterns of dealing with cases" rather than dealing "with cases on a case-by-case basis." Tr. at 287.

He gave an example of a now retired, highly respected trial judge who had "a policy that the first offense of DUI required seven days of jail time." *Id.* He explained "there was no discussion about it, [the judge] would not accept a plea agreement that did not include seven days of jail time," and there were no circumstances in which the judge would ever deviate from the policy. *Id.* He added that he is "constantly" dealing with another county that takes a "wholesale approach to the issues of no contact orders." *Id.* And he testified there are "several other courts that have wholesale policies that do not allow for any discussion to be conducted" before rejecting plea agreements with terms that judges are categorically unwilling to consider. *Id.* at 288.

It could be that all those judges have long been routinely violating the Code of Judicial Conduct. Or maybe there is a principled distinction between having a blanket policy to reject all fixed-plea sentence bargains and having a blanket policy to reject all sentence bargains that do or don't contain certain terms for narrower categories of cases involving certain crimes or criminal histories. But the Commission doesn't explain the distinction, and the limiting principles aren't obvious.

Guilfoyle's counsel also testified that while this judge began taking a categorical approach to rejecting plea agreements with stipulated terms, he did not take a categorical approach to sentencing and instead considered the specific facts of each case. *Id.* at 285–86. It would seem perverse to condone the current common practice of categorically rejecting plea agreements with terms that judges deem too lenient as a matter of policy while condemning a judicial practice of rejecting plea agreements to preserve the judge's ability to exercise case-specific sentencing discretion, including through downward sentence modification.

## C.

Third, the Commission argues the judge's transparency made things worse, because his "verbalization of his no-plea-agreement policy to members of the Bar and community further damaged public confidence in the impartiality and integrity of the judiciary." Commission's Tender of Proposed Findings at 36, ¶ 126. That strikes me as backwards; we should want these policies in the daylight so they can be reviewed more easily. While our Court has held that judges aren't required to give reasons for rejecting plea agreements, *Meadows v. State*, 428 N.E.2d 1232, 1235 (Ind. 1981), we've also said the better practice is to do so, *Ellis v. State*, 744 N.E.2d 425, 429 (Ind. 2001). Here, a secret policy would have been worse than the publicly stated policy.

## D.

Fourth, the Commission doesn't confront the judge's reasons for adopting his policy. We have acknowledged that our criminal justice system is primarily one of pleas rather than trials, *Miller v. Patel*, 212 N.E.3d 639, 650 (Ind. 2023), but that observation has come with plenty of

lament. Early on, our Court condemned plea bargaining as "corrupt." *Golden v. State*, 49 Ind. 424, 427 (1875). About a century later, our view evolved to what is now the predominant view around the country, which is that plea bargaining is a widespread practice that offers benefits to both prosecutors and defendants.

> For the State, the massive backlog of cases in our courts is well known. If a conviction can be obtained without the need for a formal trial the wheels of justice are accelerated thus enabling law enforcement personnel to conduct more extensive investigations and vigorous prosecutions of other cases in the fight against crime. For the defendant, it clearly increases the likelihood of a lighter sentence than he might otherwise receive. Were there no plea bargaining allowed, the prosecution would have no reason to seek other than the maximum sentence. Such a procedure also relieves the defendant and his family of a great deal of anxiety and embarrassment which might result from a protracted jury trial.

*Dube v. State*, 275 N.E.2d 7, 9 (Ind. 1971); *see also Anderson v. State*, 269 N.E.3d 817, 823 (Ind. 2025) (explaining plea bargaining's "mutual benefits between the parties").

But our acknowledgment of plea bargaining's benefits has come with plenty of worry that "there are accompanying dangers inherent in the practice," including that, without appropriate guardrails, it could be "used as a coercive force to obtain pleas of guilty." *Dube*, 275 N.E.2d at 9. Just a few years after recognizing the legitimacy of plea bargaining, our Court still described it as "a highly questionable practice at its best." *Ballard v. State*, 318 N.E.2d 798, 810 (Ind. 1974); *see generally* 16A Ind. Prac., Criminal Procedure-Trial § 13.1 (2025) (noting the "continuing reservations about the practice of plea bargaining").

Plenty of judges and commentators have expressed similar concerns. For example, Justice Scalia described plea bargaining as "a necessary evil":

It presents grave risks of prosecutorial overcharging that effectively compels an innocent defendant to avoid massive risk by pleading guilty to a lesser offense; and for guilty defendants it often—perhaps usually—results in a sentence well below what the law prescribes for the actual crime. But even so, we accept plea bargaining because many believe that without it our long and expensive process of criminal trial could not sustain the burden imposed on it, and our system of criminal justice would grind to a halt.

*Lafler v. Cooper*, 566 U.S. 156, 185 (2012) (Scalia, J., dissenting); *see also Wilmore*, 282 F. Supp. 3d at 941, 943–45 (rejecting a plea agreement after concluding "the common justifications behind plea bargaining no longer have any substantial heft"; emphasizing the "paramount importance [of] the public's deeply-rooted interest in a criminal trial by jury" and that "[j]uries are vital to a vibrant democracy and to a transparent and effective criminal justice system"; and expressing concern that "the United States criminal justice system has transitioned from a realm of public participation to one of public exclusion where justice is dealt and plays out in backroom deals and empty courtrooms" (quotations and footnotes omitted)).

While this judge's policy was unusual, his reasoning tracked the case law. Both our Court and the United States Supreme Court have expressed concerns about plea bargaining but concluded it is something we must tolerate to manage dockets with limited resources. This judge concluded he could manage his docket without one form of plea bargains—fixed-plea sentence bargains—which appears to be undisputed. If, as Justice Scalia described, plea bargaining is a "necessary evil," then I'm not sure a judge should be disciplined for eliminating some form of that evil where it is no longer necessary.

The judge also concluded his policy was fairer to defendants. Accepting sentence bargains with stipulated terms would eliminate the judge's discretion to modify the sentence later unless the prosecutor consented to the modification, which he believed sometimes undermined his ability to fulfill the constitutional directive that the criminal justice system is

reformative rather than retributive. Ind. Const. art. 1, § 18 ("The penal code shall be founded on the principles of reformation, and not of vindictive justice.").

As he explained:

> Pleas made open to the court are modifiable. More often than not, I have rejected modifications of major felony sentences over the years but there are instances when the court was able to move people before it forward in a different way because it was not constrained by agreed upon language that could never fully consider how a defendant would respond to consequences assessed at one point in time and their ability to respond affirmatively at another. I do not work in the volume court where such concepts are more mechanical and the sentences are suspended altogether or for short durations. I work in the court where long terms of incarceration are the starting point and rehabilitation, which is the stated goal of the penal system as enshrined in our State Constitution, is harder to assess, pursue and obtain.

Commission's Ex. 8 at 2.

Consistent with this view, in two of the five plea agreements the Commission identified, the judge ultimately imposed the same sentence as the proposed plea agreement, so the only difference was the judge maintained the ability to modify the sentence later if circumstances warranted a modification. In the other three, the prosecutor dismissed the charges and refiled in another court. The Commission does not identify any agreements the judge rejected where the defendant then received a sentence different from the terms to which the parties proposed. And again, the Commission's own witness, Guilfoyle's counsel, shared many of the judge's concerns and held a similar view that he didn't "particularly care for [plea bargaining] in most cases." Tr. at 282, 284–85.

All that said, I still agree with Chief Justice Rush at least to a point—I'm skeptical the judge's categorical approach was the best one. But I'm

equally skeptical that it reflects a clear and convincing violation of the Code. And if we're going to start disciplining judges for insisting on preserving their ability to later modify sentences, we should probably be prepared to discipline judges who categorically refuse to consider alternatives to incarceration for certain crimes, but I'm not yet prepared to do that either.

At bottom, if we are concerned with categorical policies for reviewing plea agreements, we have better options than judicial discipline for reviewing that question while it remains one of first impression. *Cf. Matter of Blickman*, 164 N.E.3d 708, 718 (Ind. 2021) ("Simply put, possibly guessing incorrectly about an unsettled legal matter, upon which reasonable minds can differ and indeed have differed, does not reflect adversely on Respondent's honesty, trustworthiness, or fitness as a lawyer.").

## III.

We have at least two other avenues for reviewing a trial judge's policy of categorically rejecting certain types of plea agreements: direct appellate review or an original action for a writ of mandamus or prohibition.

If a trial judge rejects a plea agreement and the defendant is later convicted of a more severe charge or receives a more severe sentence, the defendant can appeal the conviction or sentence. *See, e.g., Meadows*, 428 N.E.2d at 1233 (appeal after the trial court rejected a plea agreement and then the jury convicted); *Snyder v. State*, 500 N.E.2d 154, 156 (Ind. 1986) (appeal after the trial court rejected a plea agreement and the defendant then pleaded guilty pursuant to a revised plea agreement). Ideally, if the defendant's complaint is that the judge rejected the plea based on a blanket policy, the record would reflect that policy. One challenge, though, is that our case law holds that the trial judge does not have to identify a reason for rejecting the plea. *Meadows*, 428 N.E.2d at 1235.

If, and only if, direct appellate review does not provide an adequate remedy, a party can file an original action in our Court requesting a writ of mandamus compelling the trial court to take or cease some action. *See State ex rel. Goldsmith v. Marion Cnty. Super. Ct., Crim. Div. No. 1*, 419

N.E.2d 109, 111 (Ind. 1981) (mandamus and contempt proceedings compelling the trial court to adhere to the terms of a plea agreement); *State ex rel. Abel v. Vigo Cir. Ct.*, 462 N.E.2d 61, 63 (Ind. 1984) (prosecutor successfully sought writs of mandamus and prohibition compelling a trial court to vacate its order granting "shock probation" and requiring the judge to order the defendant to serve his executed sentence). "Original actions are viewed with disfavor and may not be used as substitutes for appeals." Ind. Original Action Rule 1(C). But they remain available to us for issuing writs of mandamus and prohibition when a trial court "has an absolute duty to act or refrain from acting." *State ex rel. Commons v. Pera*, 987 N.E.2d 1074, 1076 (Ind. 2013).

The judge here is far from the first to impose categorical limits on plea bargains. Courts around the country have reviewed those policies through direct appellate review and requests for writs, and they almost always view those policies much like the special masters did here, concluding that the categorical, rather than individualized, treatment is an abuse of discretion. *See, e.g., In re United States*, 32 F.4th 584, 589–90, 595 (6th Cir. 2022) (granting the prosecutor's request for "a writ of mandamus directing the district court to reconsider the parties' plea agreement and cease its 'practice' of prohibiting all plea agreements containing appeal waivers" and explaining that a trial court "cannot reject a plea agreement based on abstract or extraneous policy considerations unrelated to the particular case, because a court which does that abdicates its duty to exercise any discretion at all").

But the view is not uniform. The precise question here divided the Arizona Supreme Court when deciding whether it was proper for a group of five Maricopa County Superior Court judges with felony dockets to summarily reject "all plea agreements containing stipulated sentences." *Espinoza v. Martin*, 894 P.2d 688, 688 (Ariz. 1995). The court was willing to review the policy through Arizona's "special action" proceeding because the question was one of statewide importance and one of first impression. *Id.* Reversing the Arizona Court of Appeals, which had upheld the policy, a majority of the Arizona Supreme Court held the policy violated the state's procedural rules governing plea agreements. *Id.* at 691.

Largely tracking the special masters' reasoning here, the majority concluded that while a trial court could "reject plea agreements with stipulated sentences after giving them individualized consideration, groups of judges may not implement policies to automatically reject all such plea agreements without considering whether a stipulated sentence is appropriate in light of the circumstances of the case." *Id.* Based on the same reasoning, that court also believed it was improper for trial judges to reject plea agreements because they were filed after a court-imposed deadline, which remains a common practice in Indiana. *Id.* at 690–91*. But see United States v. Gamboa*, 166 F.3d 1327, 1331 (11th Cir. 1999) (holding that a court "may reject guilty pleas that are tendered after a deadline set by the court" based on the court's view that the policy is "necessary to prevent the needless waste of the jury's time and for effective management of its docket"); *People v. Grove*, 566 N.W.2d 547, 558 (Mich. 1997) ("We conclude that rejection of a tardy plea is within the discretion of a trial court."), *superseded by statute*; *People v. Jasper*, 17 P.3d 807, 814 (Colo. 2001) ("We hold that it is not an abuse of discretion for the trial court to reject a plea bargain solely for failure to tender it before a court-imposed plea deadline."), *as modified on denial of reh'g*.

Other justices disagreed. Justice Zlaket concurred only in part because the policy was an unapproved local rule, but he also concluded that a trial judge's discretion to reject plea agreements alone authorized the judge to "summarily reject those containing stipulated sentences." *Espinoza*, 894 P.2d at 696 (Zlaket, J., concurring in part and dissenting in part). Justice Martone dissented and would have adopted the court of appeals' opinion approving the policy because he concluded the policy was a laudable effort of "five trial judges to improve our criminal justice system." *Id.* at 696 (Martone, J., dissenting). He went further, lamenting that Arizona has "not been at the forefront of reform in the criminal justice system" and urging his court to be "in the business of rewarding creative efforts" of the judges who adopted the policy. *Id.* at 698. Other courts and prosecutors have agreed. *See United States v. Papke*, 149 F.4th 1169, 1190 (10th Cir. 2025) (noting the government's argument that the district court did not abuse its discretion by adopting a Chambers Rule to categorically reject sentence bargains where the court implemented the rule "simply because it does

not want to have its discretion limited"); *United States v. Moore*, 637 F.2d 1194, 1196 (8th Cir. 1981) (explaining that "a district court is under no duty to consider a negotiated plea agreement"); *United States v. Stamey*, 569 F.2d 805, 806 (4th Cir. 1978) (holding that a trial judge "was not required to consider the substance of" the plea agreement before deciding to reject it on the basis that plea bargaining in the district "had gone too far" and that "plea bargaining agreements [would] no longer be recognized"); *United States v. Jackson*, 563 F.2d 1145, 1148 (4th Cir. 1977) ("In our opinion each individual judge is free to decide whether, and to what degree, he will entertain plea bargains, and his refusal to consider any plea bargaining whatsoever will not vitiate a guilty plea which has otherwise been knowingly and voluntarily entered.").

The Commission does not cite any examples where a court has reviewed through judicial discipline proceedings a trial judge's policy for reviewing plea agreements. Of course, the Commission presented the question to us through judicial discipline proceedings here, and we assigned the special masters the task of considering the question in the first instance. So I certainly don't fault the special masters for completing the assignment, and I applaud their thoughtful, thorough work. They also had no way of knowing which, if any, of their other conclusions we would accept on review, so they appropriately answered all the questions before them. But we're in a different position when we review their report and the subsequent briefing on the petition for review. And it strikes me as unfair to trial judges to unnecessarily decide this question of first impression through judicial discipline proceedings rather than through direct appellate review or through an original action for a writ.

For those reasons, my vote is to adopt the special masters' findings and conclusions only as to Counts I and II.